705 A.2d 360

HAROLD RAYMOND MANN AND REGIONAL TRUCKING COMPANY, INC., PLAINTIFFS–APPELLANTS, v. INTERSTATE FIRE & CASUALTY COMPANY, DEFENDANT–RESPONDENT, AND SCIARRA INSURANCE AGENCY, INC., MCCONAGHY SPECIAL RISKS, INC., AND DOROTHY KISAL, ADMINISTRATOR AD PROSEQUENDUM AND GENERAL ADMINISTRATOR OF THE ESTATE OF GUY KISAL, DECEASED, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued December 16, 1997—Decided January 23, 1998.

Before Judges STERN, KLEINER and KIMMELMAN.

*Francis X. Garrity*, argued the cause for appellants (*Garrity, Graham, Favetta & Flinn*, attorneys; *Mr. Garrity*, of counsel; *Jo Ann Katzban*, on the brief).

*Richard D. Picini*, argued the cause for respondent (*Picillo Caruso*, attorneys; *Mr. Picini*, of counsel; *Adrienne Matthews*, on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

Upon leave to appeal, plaintiffs, Harold Raymond Mann and Regional Trucking Company, Inc. (Regional), appeal from the grant of summary judgment to defendant, Interstate Fire & Casualty Company (Interstate), in a declaratory judgment action seeking indemnification and a defense in a wrongful death action. We conclude that the motion judge failed to properly consider the issues of dual agency and apparent authority and failed to recognize that defendant's potential liability to plaintiffs raised sufficient material issues of fact warranting submission of the issue to the trier of fact after a plenary hearing. We reverse.

On February 10, 1992, Guy Kisal, a Pennsylvania resident, was killed when he was struck by a tandem tractor/trailer owned by plaintiff Regional and operated by its employee, plaintiff Mann. On January 27, 1994, Dorothy Kisal, as administrator ad prosequendum and general administratrix of the Estate of Guy Kisal, instituted suit in the Superior Court, Law Division, Essex County against both Regional and Mann. Regional demanded that Interstate afford insurance coverage and pay on behalf of Regional and Mann all sums in excess of primary underlying coverage which they may become obligated to pay as damages to Kisal. Interstate denied coverage, thus prompting this declaratory judgment action.

Regional is engaged as an ICC certified carrier in the hauling of goods in interstate commerce. Prior to February 10, 1992, Regional was affiliated with two other ICC certified carriers, R.G.

Truck Leasing and Reisch Trucking & Transportation. All three companies utilized the Sciarra Agency as their insurance broker.

From March 20, 1991, to March 20, 1992, Interstate afforded excess coverage to R.G. Truck Leasing under a policy issued in Pennsylvania providing liability coverage for accidents resulting in bodily injury in excess of $1 million and up to $4 million. Since Interstate was not then an admitted insurance company in Pennsylvania, it was required to comply with the Pennsylvania Surplus Lines Law, 40 *Pa. Stat.* § 991.1615, which requires that any Interstate policy be issued through a certified Surplus Lines Agent.[1]

---

[1] Pennsylvania Surplus Lines Law, 40 *Pa. Stat.* § 991.1615, entitled "Licensing of surplus lines licensee," provides:

(a) No agent or broker licensed by the department shall transact surplus lines insurance with any nonadmitted insurer unless such agent or broker possesses a valid surplus lines agent's license issued by the department.

(b) The department shall issue a surplus lines agent's license to any resident of this Commonwealth who is a qualified holder of a current property and casualty broker's license, but only when the broker has complied with the following:

(1) Remitted the license fee to the department.

(2) Submitted a properly completed license application on a form supplied by the department.

(3) Passed a qualifying examination approved by the department, except that all holders of a license prior to the effective date of this article shall be deemed to have passed such an examination.

(4) Filed with the department and maintained concurrent with the term of the license, in force and unimpaired, a bond in favor of the Commonwealth of Pennsylvania in the penal sum of at least fifty thousand ($50,-000) dollars, aggregate liability, with corporate sureties approved by the department. The bond shall be conditioned that the surplus lines licensee will conduct business in accordance with the provisions of this article and will promptly remit the taxes as provided by law. No bond shall be terminated except for nonpayment of premiums. Termination notice shall be given to the surplus lines licensee and to the department at least thirty (30) days prior to the termination date.

(c) Corporations and partnerships shall be eligible to be resident surplus lines licensees, upon the following conditions:

(1) The corporation or partnership licensee shall list all employees, including at least one active officer or partner, who have satisfied the requirements of this article to become surplus lines licensees.

Interstate's insurance policy with R.G. Leasing was procured by the Sciarra Agency through McConaghy Special Risk, Inc. (McConaghy), which had offices in Collingswood, New Jersey. McConaghy is identified on the declaration page of the Interstate policy issued to R.G. Truck Leasing as "Agent or Broker." It is undisputed in the record on appeal that Sciarra Agency was not an approved broker or surplus lines agent for Interstate. Thus, Sciarra Agency, in order to purchase an Interstate policy on behalf of one of its customers, was required to deal with a surplus lines broker or agent for Interstate.[2] It is undisputed that when R.G. Truck Leasing secured its Interstate excess policy, it contact-

---

(2) Only those employees resident in this Commonwealth holding a certificate of eligibility may transact surplus lines insurance.

(d) Each surplus lines license shall expire on the last day of February of each year and shall be renewed before March 1 of each year upon payment of the annual fee, in compliance with other provisions of this section. Any surplus lines licensee who fails to apply for renewal of a license before expiration of the current license shall pay a penalty of two times the license fee and be subject to other penalties as provided by law before his license will be renewed.

[2] Interstate and McConaghy are parties to a "Broker Agreement" effective July 26, 1988, in which McConaghy is designated a "broker." Under that agreement, a "Broker" is defined as an "independent contractor." The agreement specifically provides, in part:

The BROKER agrees that, except the prior written authorization of INTERSTATE, the BROKER has no authority:

O   to issue binders, policies, endorsements or insurance certificates or to otherwise bind coverage on behalf of INTERSTATE; or

O   to waive or extend any condition of a policy or application or to make, alter, vary or discharge any policy contract; or

O   to make representations on behalf of INTERSTATE including, but not limited to, representations regarding the application of coverage to specific situations; or

O   to extend time for payment of premiums; or

O   to insert any advertisement regarding INTERSTATE in any publication whatsoever or to issue or cause to have issued any letter, circular, pamphlet or other publication or statement referring to INTERSTATE; or

O   to incur any liability on behalf of INTERSTATE; or

O   to act in any way as an agent of INTERSTATE.

ed Sciarra Agency, who then contacted McConaghy, who then communicated with Interstate.

While the Interstate excess policy insuring R.G. Truck Leasing was in place prior to Kisal's death, R.G. Truck Leasing's operations were taken over by Regional. Regional contacted Sciarra Agency and requested that the Interstate policy be amended to reflect Regional as the named insured. In accord with prior practice, Sciarra Agency requested, both orally and by facsimile, McConaghy to either secure an appropriate amendment to the Interstate policy changing the name of the named insured or to provide it with a new application for excess insurance to be completed by Regional for transmission to Interstate.

As of the date of Kisal's death, McConaghy had not acted on Sciarra Agency's request.[3] Thus, when Regional demanded indemnification and a defense of Kisal's wrongful death complaint, Interstate denied coverage.

In the Law Division, Regional contended that McConaghy acted as a dual agent. It contended that McConaghy had a duty to act with the requisite degree of skill and knowledge to procure requested excess insurance coverage as the agent of Sciarra Agency, who was the agent of Regional. It also contended that McConaghy was acting as the agent of Interstate in processing applications for insurance and providing information to Interstate relating to prospective customer's risks. It contended that when McConaghy failed to communicate with Interstate after being first contacted by the Sciarra Agency, it breached its obligation to both Regional and Interstate and thus, to the extent that Regional would have been afforded coverage, Interstate was obligated to indemnify and defend it in Kisal's wrongful death claim. As noted, on cross-motions for summary judgment, the Law Division concluded that McConaghy was not the agent of Interstate for the purpose of transmitting Regional's request for excess coverage to

---

[3] Regional's brief on appeal asserts that both the Sciarra Agency and McConaghy are no longer in business and that neither agency maintained an errors and omissions insurance policy.

Interstate and thus that Interstate was not vicariously liable for McConaghy's negligence.

## I

An analysis of the factual contentions submitted by both parties in support of their respective motions and cross-motions for summary judgment turns on the special relationship between the parties and the roles and responsibilities of the several parties in securing an excess insurance policy for Regional.

In an effort to buttress its contentions, Regional provided the motion judge with excerpts of deposition testimony. Justin Sciarra of Sciarra Agency testified that in order to obtain an Interstate policy for a putative insured, its customer, his agency was required to contact McConaghy to discuss the risk and to provide McConaghy with the customer's loss information, the nature of the business and extent of its business as reflected in its income, identification of the customer's primary insurance coverage, and the number of vehicles owned or operated by the customer. The requisite information then would be forwarded by McConaghy to Interstate. Once an application for excess insurance was evaluated, Interstate would quote a rate to McConaghy and McConaghy would transmit the rate information to Sciarra Agency. If the rate was accepted by the prospective insured, Interstate would bill McConaghy, and upon receipt of payment by the insured, McConaghy would pay a commission to Sciarra Agency.

In July 1991, Regional took over the business operations of R.G. Truck Leasing. It retained all of R.G. Truck Leasing's customers. All trucks that had been leased to R.G. Truck Leasing were either owned or under long term lease to Regional. Owners and operators under contract to R.G. Leasing were given new contracts with Regional. On July 26, 1991, Sciarra Agency procured primary insurance coverage for Regional with New Hampshire Insurance Company.[4] On September 17, 1991, Sciarra Agency contacted

---

[4] Under the Interstate excess insurance policy issued to R.G. Truck Leasing, Travelers Insurance Company was designated as its primary insurance carrier.

McConaghy, as noted above, to amend the Interstate excess insurance policy to reflect that Regional was the named insured or to request a new application for insurance if required by Interstate.

The record is clear that although McConaghy did not recall his conversation with the Sciarra agency on September 17, 1991, he did receive a facsimile on the same date confirming the conversation and requesting either a policy amendment or a new insurance application to be used by Regional.

At depositions, James Pye, an underwriter and executive of Interstate, admitted that Interstate was not "open to the general brokerage public" and it only dealt with approved brokers with whom it had a brokerage contract. He recognized that McConaghy was an approved broker.[5]

When Interstate declined coverage to Regional, it indicated that McConaghy did not provide information that R.G. Truck Leasing had been taken over by Regional, that R.G. Truck Leasing's policy of primary insurance with Traveler's insurance Company had been canceled, or that Regional had secured primary insurance coverage with New Hampshire Insurance Company.

## II

To a substantial extent this analysis is similar to and is guided by our Supreme Court's decision in *Sears Mortgage Corp. v. Rose*, 134 *N.J.* 326, 634 *A*.2d 74 (1993). In *Sears*, the Court concluded that a closing real estate attorney retained by a purchaser of land may be found to be the agent of the title-insurance company for the purpose of applying moneys to satisfy and cancel

---

[5] Although Pye did not know whether Interstate would have issued a policy in excess to the primary policy issued by New Hampshire Insurance Company, evidence in the record reflects that during 1991 New Hampshire Insurance Company was rated A+ (superior) by A.M. Best. We recognize that this issue requires resolution and anticipate that the issue would be one to be considered at a plenary hearing.

an existing mortgage, securing clear title for the purchaser, and obtaining from the carrier a title-insurance policy covering that title. *Id.* at 337, 634 *A.*2d 74. The Supreme Court specifically concluded that despite an agreement between parties specifying the nature of their relationship, "the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation." *Ibid.* (citing *Henningsen v. Bloomfield Motors,* 32 *N.J.* 358, 161 *A.*2d 69 (1960)). Thus, the written brokerage agreement between Interstate and McConaghy, defining McConaghy as a broker "without authority … to act in any way as an agent of Interstate," but which also designates McConaghy as an "independent contractor," *supra* note 2, is not dispositive of the issues requiring disposition.

In determining whether defendant was entitled to summary judgment, the motion judge was compelled to analyze the totality of the facts presented by the pleadings, certifications, and deposition testimony. The judge was obligated to discern from all the evidence presented whether, despite the written brokerage agreement between Interstate and McConaghy, there existed facts which clothed McConaghy with the apparent authority based on manifestations of that authority by the principal, or implied authority inferred from the nature or extent of the function to be performed, the general course of conducting the business, or from the particular circumstances in the case. *Sears, supra,* 134 *N.J.* at 338, 634 *A.*2d 74 (citing *Carlson v. Hannah,* 6 *N.J.* 202, 212, 78 *A.*2d 83 (1951)). Our law recognizes that an agent or broker can act as both the agent of the insured and the insurer during a particular transaction. *Spilka v. South America Managers, Inc.,* 54 *N.J.* 452, 463, 255 *A.*2d 755 (1969). As stated in *American Well Works v. Royal Indemnity Co.,* 109 *N.J.L.* 104, 160 *A.* 560 (E. & A. 1932):

> The rule is that the principal is bound by the acts of his agent within the apparent authority which he knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. The question in every case depending upon the apparent authority of the agent is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary

prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question; and when ... the party, relying upon such apparent authority, presents evidence which would justify a finding in his favor, he is entitled to have the question submitted to the jury.

*[Id.* at 108, 160 *A.* 560.]

*See also* Applemann, 16 *Insurance Law and Practice,* § 8736 (1981) ("It is not unusual for an insurance agency to represent both insurer and insured ...").

This same concept was recently discussed in *Rodriguez v. Hudson County Collision Co.,* 296 *N.J.Super.* 213, 686 *A.*2d 776 (App.Div.1997), where this court stated that "[a]pparent authority arises when a principal 'acts in such a manner as to convey the impression to a third party that the agent has certain power which he may or not [sic] possess.'" *Id.* at 220, 686 *A.*2d 776 (quoting *Lampley v. Davis Machine Corp.,* 219 *N.J.Super.* 540, 548, 530 *A.*2d 1254 (App.Div.1987)). We particularly noted in *Rodriguez:*

Liability will be imposed upon the principal in cases involving apparent authority where the actions of a principal have misled a third party into believing that a relationship of authority existed and where the third party has relied upon this belief to his or her detriment.

*[Id.* at 221, 686 *A.*2d 776 (citations omitted).]

Here, the facts as presented by the certifications and deposition testimony clearly reveal that the general public may not deal directly with Interstate to secure a policy of excess insurance. In fact, licensed insurance agents or brokers may not obtain a policy of excess insurance from Interstate by direct contact with an Interstate underwriter or executive. Interstate only accepts applications for excess insurance from approved designated "brokers" who are defined as "independent contractors." Yet, under the Pennsylvania Surplus Lines Law, 40 *Pa. Stat.* § 991.1604 and § 991.1615, Interstate is required to appoint a surplus lines *agent* in Pennsylvania to issue insurance. Despite the title or status of McConaghy, as contractually designated by Interstate, or as denominated under Pennsylvania statutes, it seems clear that McConaghy has the designated responsibility delineated by, and under the control of, Interstate, to receive on behalf of Interstate

all applications for excess insurance, to process those applications together with required information gathered from the putative customer, and the additional responsibility of communicating the rate for insurance which Interstate agrees to write for the potential customer. It appears, therefore, that McConaghy was serving in a dual capacity: as the agent for the prospective customer *and* the agent for Interstate to process applications for insurance and to effectuate the completed insurance policy purchase.

To the degree that McConaghy negligently processed Sciarra Agency's request to amend the policy of insurance issued to R.G. Truck Leasing to reflect Regional as a named insured or, alternatively, to obtain an application for insurance to enable Regional to apply for a new excess insurance policy, its negligence may be chargeable to Interstate under a theory of *respondeat superior. See Sears, supra,* 134 *N.J.* at 346, 634 *A.*2d 74 (concluding that a title insurance company was liable for a theft committed by its designated closing attorney even though the attorney was retained to represent the purchaser).

As *Sears* instructs: "Of particular importance is whether a third party has relied on the agent's apparent authority to act for a principal." *Id.* at 338, 634 *A.*2d 74 (citing *N. Rothenberg & Son v. Nako,* 49 *N.J.Super.* 372, 382–83, 139 *A.*2d 783 (App.Div.1958)). Although the motion judge failed to consider the reliance issue, it seems clear from the record that Sciarra Agency clearly relied on McConaghy to accomplish one of three intended goals: either (1) to secure an amendment to the R.G. Truck Leasing excess insurance policy to reflect a change in the named insured; or (2) to obtain an application which would permit Regional to apply for a new policy providing excess insurance coverage; or (3) to obtain a prompt reply from Interstate of its intent not to underwrite a policy of excess insurance, thus permitting Regional to seek coverage with another excess lines carrier. Reliance appears obvious, as under the facts presented, Sciarra Agency was required by Interstate to deal with McConaghy.

Our decision does not reach the ultimate question to be determined, that is, whether Regional was actually damaged by the alleged defalcation of duty by McConaghy. Stated differently, had McConaghy communicated with Interstate in a timely fashion, would Interstate have amended the R.G. Truck Leasing policy to reflect Regional as the named insured? In the alternative, would it have required Regional to apply for its own policy of surplus insurance and, if so, would Interstate have issued a new policy to Regional based on its application? These issues were not briefed or argued on the motion for summary judgment and may not be addressed in this opinion. *Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973). Additionally, we need not address Regional's additional argument that Interstate is liable to it regardless of the change in primary coverage. Although raised by Regional before the motion judge, the issue raised was not addressed by the judge, as he concluded that McConaghy was not Interstate's agent.

We conclude that *Rule* 4:46–2 precluded the grant of summary judgment on the agency issue because the pleadings, depositions, and certifications demonstrate that there were genuine issues of material fact presented on the agency issue sufficient to warrant submission of this issue to the trier of fact. *Brill v. Guardian Life Insurance Co.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

Reversed and remanded for further proceedings consistent with this opinion.