**AUTOMATED SALVAGE TRANSPORT, INC., etc., et al., Plaintiffs,**

v.

**NV KONINKLIJKE KNP BT, et al., Defendants.**

**No. CIV.A. 96–369.**

United States District Court, D. New Jersey.

Dec. 23, 1999.

608

Stephen L. Dreyfuss, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, Robert A. Weiner, Y. David Scharf, Barbra R. Funt, McDermott, Will & Emery, New York City, for Plaintiffs.

Benjamin P. Michel, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, David G. Keyko, Daniel Z. Mollin, Sheryl L. Reba, Winthrop, Stimson, Putnam & Roberts, New York City, for Defendants.

## OPINION

WOLIN, District Judge.

This case is before the Court on the summary judgment motion of defendants NV Koninklijke KNP BT ("KNP") and KNP BT Paper Recycling BV ("KNP Recycling") (collectively "defendants" or "KNP defendants") to dismiss most counts of the Second Amended Complaint of the plaintiffs Automated Salvage Transport Inc. ("Automated Salvage"), Kruger Recycling Inc. ("Kruger Recycling"), Multi Material Management & Marketing ("EMS"), Newark Group Industries Inc. ("Newark Group"), Prins Recycling Corp. ("Prins Recycling"), United Paper Stock Co., Inc. ("United Paper") and Zozzaro Brothers, Inc. ("Zozzaro Brothers") (collectively, "plaintiffs") pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court has decided the matter pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons stated below, the defendants' motion will be granted in part and denied in part.

## BACKGROUND

This case concerns the plaintiffs' allegations that to overcome a temporary drop in the profitability of "Old Newspaper," the defendants plotted to deflate the price of that paper by ordering and then refusing to accept "thousands of tons" of paper valued at millions of dollars. The plaintiffs assert that the scheme was accomplished through the defendants' use of a pulp broker, Nielsen & Nielsen, which the plaintiffs since have placed in Chapter 7 bankruptcy because the broker could not pay for the Old Newspaper (R. Nielsen Tr. at 88; A Nielsen Tr. at 64–65; Weiner Aff. Ex AQ), for which the plaintiffs now claim that the defendants are liable. The claims pertinent to this motion sound in breach of contract—primarily through an agency relationship—and fraud. Because this case is before the Court upon defendants' motion for summary judgment, the facts are related, predominantly, as they appear in

plaintiffs' opposition papers. The Court, however, will highlight a few significant facts which defendants dispute.

## I. The Parties

### A. The Plaintiffs

All of the parties are United States suppliers of secondary paper fibers, commonly referred to as "recyclable waste paper."

*Automated Salvage.* Automated Salvage is a corporation organized under the laws of the State of Connecticut. It has its principal place of business in Kensington, Connecticut. (Mollin Aff., Ex. 1).

*Kruger Recycling.* Kruger Recycling is a corporation organized under the laws of the State of Delaware. It has its principal place of business in Albany, New York. (*Id.*).

*EMS.* EMS is a corporation organized under the laws of the State of California. Its principal place of business is in Oakland, California. (*Id.*).

*Newark Group.* Newark Group is a corporation organized under the laws of the State of New Jersey. Its principal place of business is in Cranford, New Jersey. (*Id.*).

*Prins Recycling.* Prins Recycling was a corporation organized under the laws of the State of Rhode Island. Its principal place of business was in Pawtucket, Rhode Island. (*Id.*).

*Zozzaro Brothers.* Zozzaro Brothers is a corporation organized under the laws of the State of New Jersey. Its principal place of business is in Clifton, New Jersey. (*Id.*).

### B. KNP and Related Entities [1]

*KNP.* KNP is a company organized under the law of the Netherlands with its principal place of business in the city of Amsterdam in the Netherlands. (Bonnier Decl. at ¶ 2). It is a holding company. (*Id.*). For the most part, it consists of three major "divisions" or "sectors": (1) KNP BT Distribution; (2) KNP BT Packaging ("KNP Packaging"); and (3) KNP Leykam (which focused on production of graphic paper). (*Id.*; Weiner Aff. Ex. I).

*KNP Recycling.* Defendant KNP Recycling is a subsidiary within the Solid Board Division of KNP Packaging ("KNP Packaging"). (Bonnier Decl. at ¶ 3). KNP Recycling supplies raw materials to the paper and board mills of operating companies within KNP and to paper and board mills that are unaffiliated with KNP. (*Id.*) Most, if not all, KNP Packaging mills use a grade of waste paper known as Old Newspaper ("ONP"). (*Id.*; Ver. Ex. BN). In 1994 and 1995, KNP Recycling supplied roughly sixty percent of the waste paper used by mills within KNP; other suppliers provided the remaining forty percent.[2] (Mollin Aff., Ex. 2).

*Henk van Belle.* Henk van Belle ("van Belle") worked for KNP Recycling. Primarily, he bought and sold recyclable waste paper. He, for the most part, bought waste paper from the trader, Nielsen & Nielsen (discussed below). The parties disagree as to whether he represented or worked for KNP, in addition to KNP Recycling. According to van Belle, he never held a position in any other companies in the KNP group, nor represented any of those companies. (van Belle Dep. at 4–8, 58, 97, 109). Plaintiffs, however, offer contrary evidence. They maintain that van Belle indicated that he represented KNP, in addition to KNP Recycling. (Meyerson Aff. at ¶ 6; Sparks Aff. at ¶ 10; B. Nielsen Tr. at 755–58, 877–78; Silverstein Aff. at ¶ 8; Soriano Tr. at 162, 728; Prins Aff. at ¶ 18; Zozzaro Aff. At ¶ 14; Klein Tr. at 163–64).

---

1. The current composition of the defendants is different than at the time of the alleged infractions. For convenience, the Court will refer to the defendants as they existed then.

2. KNP Recycling supplied KNP with roughly 75% of the ONP it purchased from the United States between September 1994 through July 1995. (Vermeulen Tr. at 17, 29–30).

***Bart van't Hul.*** Bart van't Hul ("van't Hul") worked at KNP Recycling. (van Belle Dep. at 7). Like van Belle, van't Hul bought and sold recyclable waste paper. He primarily bought paper from the trader, Pacific Forest Resources (discussed below).

***Bep Nabuurs.*** Bep Nabuurs ("Nabuurs") was the general manager of KNP Recycling. He was the highest official at KNP Recycling. (*Id.*).

***Henri Vermeulen.*** Henri Vermeulen ("Vermeulen") was KNP Recycling's commercial director. He was the second highest official at KNP Recycling. (*Id.*).

### C. Non-parties

***Nielsen & Nielsen.*** Non-party Nielsen & Nielsen ("N & N") was a California based trader of waste paper. According to defendants' evidence, it was in the business of buying paper, taking title to the paper, and reselling the paper at a markup. (Mollin Aff., Ex. 3). Plaintiffs, however, contend that N & N merely acted as the KNP defendants' purchasing agent with regards to the transactions at issue. (Nielsen Tr. at 806; Sparks Aff. § 24).

***Bryan Nielsen.*** Bryan Nielsen ("Nielsen") was the Chief Financial Officer and Executive Vice President of N & N. He primarily worked in the international waste paper trade. (Mollin Aff., Ex. 3).

van Belle was Nielsen's contact person at KNP Recycling. (van Belle Dep. at 9). As discussed below, beginning in 1994, van Belle ordered or purchased American waste paper through N & N and Nielsen. (van Belle Dep. at 13).

***Pacific Forest Resources and Victor Rice.*** Non-party Pacific Forest Resources ("Pacific Forest"), like N & N, was a waste paper trader. (Rice Dep. at 10). Since the 1980's, KNP Recycling[3] purchased waste paper from Pacific Forest. (*Id.*) Victor Rice ("Rice"), Pacific Forest's Senior Vice President, dealt with van't Hul regarding the sale of ONP. (*Id.* at 7–8, 11–12).

### II. Factual Record

In *Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT*, No. Civ. A. 96–369, 1997 WL 576402 (D.N.J. Sept.12, 1997), the Court extensively discussed the Plaintiff's allegations. In brief, the claims pertinent to this motion consist of (1) breach of contract, (2) promissory estoppel, (3) breach of covenant of good faith and fair dealing, and (4) fraud. Significantly, the breach of contract claims hinge upon whether N & N acted as defendants' agent.

To avoid undue repetition with its prior opinion, the Court will briefly recount pertinent background information. First, the Court will set forth material portions of the plaintiffs' evidence. After that, the Court will discuss some portions of the defendants' evidence and the defendants' dispute with plaintiffs' evidence.

### A. Plaintiffs' Factual Record[4]

During the early 1990's, Dutch paper companies, including KNP, experienced financial problems resulting from an increased cost in raw materials and a decline in selling prices. (Weiner Aff. Ex. E— KNP 1991 Report at 17). According to a KNP annual report, KNP companies "suffered considerably in 1994 from the explosive increase in waste paper prices." (*Id.* at 26).

In fall 1994, due to shortages of paper in Europe and the quality of paper in the United States, KNP Recycling sought to purchase more ONP from the United States. (Nabuurs Dep. at 36–37). Thus, in addition to its longstanding relationship with non-party Pacific Forest, KNP Recycling entered into a purchasing relationship with N & N which had contacts with

---

3. KNP Recycling operated under different names during that time.

4. Plaintiffs' factual record consists of affidavits, deposition testimony, and exhibits.

many United States waste paper producers.[5]

In the spring of 1995, ONP prices were still extraordinarily high. (Moore Rpt. at 53–54). To reduce these prices, plaintiffs contend that the KNP defendants plotted to manipulate the waste paper market. Plaintiffs maintain that the KNP defendants believed that the market of waste paper, including ONP, was in a "delicate balance." As a result, the KNP defendants believed as little as 10,000 metric tons of additional demand could affect the price of waste paper. Plaintiffs allege that KNP schemed to order, but not pay for, substantial tonnage. Once ordered, the KNP defendants would not buy the waste paper. Hence, the price would fall when the false demand was lifted. At that time, the KNP defendants would purchase the waste paper at a lower price.[6]

As evidence of this scheme, plaintiffs point to a May 3, 1995, meeting of a KNP Policy group and KNP's subsequent actions. (Vermeulen Ex. BN). Vermeulen and many other KNP executives participated in the meeting. (Vermeulen Ex. BN.) The meeting minutes state:

> It was decided to make a project out of the trends of the stocks in coming months, keeping track of demand, dropoff and purchases in the U.S. With this, the next Policy Group meeting can decide what steps have to be taken. For the time being, *no further purchases should take place in the U.S.* In all, 55,000 tons were/are being bought in the U.S. on behalf of [various mill companies within the KNP Group.]

(*Id.*) (emphasis added). In short, plaintiffs point out that, at this meeting, the KNP defendants decided to refrain from purchasing ONP in the United States,[7] but, at about the same time, KNP represented to United States ONP suppliers that it was still in the market. Specifically, defendants instructed its representatives to negotiate and order—but not pay for—a substantial amount of ONP. (Pl. St. Undis. Facts §§ 132–315).

Indeed, in April and May 1995, van Belle, as KNP Recycling's contact person, traveled to the United States to meet with Nielsen, of N & N. (Nielsen Tr. at 543–44). The stated purpose of van Belle's trip was to source additional tonnage of ONP, as well as investigating future cooperation between KNP, N & N, and U.S. waste paper suppliers. (Vermeulen Ex. BK). Together, van Belle and Nielsen met with the various plaintiffs around the country.[8] (Pl. St. Undis. Facts §§ 102–315). They entered into discussions with plaintiffs and toured plaintiffs' facilities. (*Id.*) First, van Belle and Nielsen met with plaintiff EMS at the end of April. (Pl. St. Undis. Facts at §§ 108–25). At the end of May, van Belle met with all other plaintiffs. (Pl. St. Undis. Facts §§ 127–315).

While much is in dispute regarding the content of these meetings, none dispute that van Belle made the following statements to plaintiffs: (1) defendants sought to purchase at least 40,000 tons of ONP and other waste paper per month, including a portion from each plaintiff; (2) defendants' purchases of ONP and other waste paper would be made through its "agent," N & N; (3) defendants would pay

---

5. As noted above, van Belle conducted KNP Recycling's purchasing efforts with N & N. van't Hul maintained his position as the contact person with Pacific Forest.

6. Plaintiffs also maintain that the rejection of these shipments also caused a supply "glut." This supply glut of distressed tonnage also caused worldwide ONP prices to fall, though not as quickly and not as much as the false demand.

7. To support their interpretation, plaintiffs cite to Vermeulen's deposition testimony. The testimony arguably indicates that, after May 1995 and prior to June 1, defendants had "no intention" of purchasing 40,000 metric tons of ONP for June and July. (Vermeulen Tr. at 318).

8. Others, including van't Hul and Vermeulen also met with some of the plaintiffs.

slightly higher than market prices to obtain a guaranteed source of supply; and (4) defendants requested plaintiffs to increase their production of ONP and other waste paper.[9] (Def. St. Undis. Facts §§ 40, 63).

In addition, van Belle indicated to the plaintiffs that "KNP"—not merely KNP Recycling—intended to purchase ONP exclusively through its "agent," N & N. (van Belle Tr. at §§ 52–53; Nielsen Tr. at 1251–52). In effect, van Belle suggested that he represented KNP as a whole, not merely KNP Recycling.

Plaintiffs and defendants discussed many other issues at these meetings. For instance, they discussed various business ventures with plaintiffs concerning ONP and other waste paper. While plaintiffs and defendants dispute the facts concerning such discussions, they need not be recounted for the purpose of deciding this motion.

On Friday, May 26, at the conclusion of van Belle's visit, van Belle, again, met with Nielsen. (Nielsen Tr. at 902). At this meeting, Nielsen gave van Belle a handwritten list of the tonnage that he thought he could purchase from plaintiffs for June shipment, along with the estimated prices. (Df. Stat. Undis. Facts § 67). Upon receiving the list, van Belle authorized Nielsen to purchase the tonnage.[10] (Nielsen Tr. at 1263). As a result of van Belle's authorization, Nielsen believed he was empowered to purchase, on behalf of KNP, up to 40,000 metric tons of ONP per month for KNP at market price. (*Id.*)

After granting this "authorization," van Belle then stated that he would send Nielsen the purchasing order numbers and contracts on the following Monday, May 28. (Nielsen Tr. at 63). Despite such assurances, neither van Belle nor anyone at KNP delivered the purchase orders.

In reliance on van Belle's authorization, Nielsen issued purchasing orders to the plaintiffs. (Pl. Stat. Undis. Facts §§ 271–76). Because e. h plaintiff viewed N & N as KNP'S purchasing agent, each plaintiff shipped substantial tonnage of ONP during the month of June. (*Id.* §§ 281–88, 311). Each plaintiff testified that they would not have shipped the ONP but for defendants' representations and their belief that defendants could pay. (*Id.*) Indeed, some plaintiffs even conducted background checks of defendants to determine whether KNP was reputable and could pay for the ONP. (*E.g.,* Richer Aff. § 5; Soriano Aff. § 28).

The invoice value for the June shipments totaled over $4 million dollars. (Pl. Stat. Undis. Facts §§ 282–88). KNP never accepted shipment of the ONP, nor did they pay plaintiffs or N & N for the shipped tonnage. Indeed, plaintiffs received nothing despite KNP's representations and N & N's orders.

At the end of June, Vermeulen traveled to the west coast. He met with Nielsen and plaintiff EMS. (Sparks Aff. § 35; Meyerson aff. § 19). During Vermeulen's visit he assured Nielsen that problems between KNP and N & N would be solved. (Nielsen Tr. at 10). Moreover, he communicated to EMS that KNP was committed to buy significant tonnage of ONP through its "agent," N & N. (Sparks Aff. § 37; Meyerson Aff. § 24). After Vermeulen's visit, N & N issued purchase orders to EMS for ONP and other waste paper. (Pl. St. Undis. Facts § 310). In reliance on the above facts, EMS shipped significant tonnage worth more than $3 million. EMS did not receive payment for the ONP and other waste paper. (*Id.* § 311). The

---

**9.** Defendants do not dispute this only for the purposes of this motion. They dispute, however, that KNP made such representations. They only admit, for the purpose of this motion, that KNP Recycling made such representations.

**10.** Defendants do not dispute this for the purposes of this motion.

invoice value of these shipments was for more than $3 million. (*Id.*)

Vermeulen met with Rice of Pacific Forest during the June trip. (Rice Tr. at 220–22). At this time, they negotiated "a 100 percent confirmed and non-renegotiable" deal for mixed waste paper. (*Id.*) Vermeulen did not comply with this agreement. (*Id.* at 221). As a result, Rice terminated Pacific Forest's long relationship with KNP. (*Id.* at 222).

On July 4, 1995, van Belle informed Nielsen that KNP was not in the market for 40,000 tons of ONP per month. (Pl. Stat. Undis. Facts § 316). At that time, plaintiffs had collectively sent thousands of tons of ONP to Europe worth millions of dollars. (*Id.*)

A month later, plaintiffs learned from N & N that KNP would not pay for the waste paper. (Pl. Stat. Undis. Facts § 320). In September 1995, counsel for several plaintiffs wrote to KNP. The letter stated:

> We have been advised that your employee, H.R.M van Belle, visited the offices of Prins and others with B. Nielsen of Nielsen & Nielsen on or about May 23, 1995. In those meetings Messrs. H.R.M. van Bell [sic] and Nielsen indicated that KNP was in need of 40,000 tons per month of secondary fiber for immediate shipments beginning June 1995, and that the purpose of their visit was to purchase fiber for your mill consisting of a mix of [ONP and mixed paper]. The companies were advised that N & N would act as KNP's agent to accomplish the above.

> Based on the conversations that took place and the representations made by Mr. van Belle, the companies shipped materials destined for your mill. They now find that they are being advised that on some alleged technicality you have chosen not to receive and pay for the materials.

> These companies, in good faith and on your employee's commitments, made the requested secondary fiber shipments. Please be advised that our clients hold KNP and Nielsen jointly responsible for their invoices and damages suffered as a result of your refusal to take delivery from Nielsen. Therefore, prompt payment is demanded for the fiber shipped and delivered to you.

(Vermeulen Ex. DN). As noted above, defendants never paid plaintiffs for the shipped tonnage.

Soon after this, the price of waste paper began to fall in the United States and Europe. (Moore Tr. at 729–30). As one waste paper trader publication reported in September 1995:

> Foreign buyers reportedly are taking advantage of the weakness in the U.S. domestic market by dropping their buying prices precipitously and being extra picky about what is shipped to them. One event in recent weeks seems to underscore the situation. It occurred last month, when several paperstock brokers sent a large shipment of several thousands of tons of various grades to a buyer in Europe which subsequently refused the shipment, leaving the cargo at the dock to incur demurrage charges.

(Weiner Aff. Ex. AS). By late September, the price of ONP and other waste paper fell significantly. (Weiner Aff. Ex. AB).

Plaintiffs maintain that defendants, through the above described conduct, fraudulently manipulated the market so that they could buy raw material for KNP at artificially low prices of ONP. In short, they argue that defendants created a false demand for ONP by placing substantial purchase orders. According to plaintiffs' expert, William Moore ("Moore"), the removal of the demand caused the prices to collapse. Once the prices collapsed, KNP began to, or at least proposed to, restock its inventory. (Weiner Aff. Ex. AB).

As a result of the above described events, N & N became bankrupt. On January, 5, 1996, N & N filed a voluntary Chapter 11 petition in the United States

Bankruptcy Court of the Central Division of California. On January 24, 1996, plaintiffs brought this suit against KNP and KNP Recycling.

### B. Defendants' Factual Record[11]

The Court will not make an exhaustive review of the defendants' factual record. Rather, the Court will primarily examine some of the disputed facts.

Defendants do not seriously dispute van Belle's dealings with N & N. Defendants, however, offer evidence which is contrary to much of the plaintiffs' evidence. Defendants put forward the following evidence:

- van Belle represented KNP Recycling only—not KNP as a whole.
- van Belle visited plaintiffs' facilities merely to inspect the quality of shipments previously ordered from N & N.
- After the May 3 meeting, defendants were still in the market for waste paper. Indeed, KNP Recycling issued purchase orders to N & N, Pacific Forest, and another United States waste paper trader. They ordered a collective 38,513 metric tons of ONP of varying qualities. Moreover, defendants argue that the language used at the May meeting does not indicate that they were permanently out of the market.
- van Belle believed that Recycling was "definitely still in the market" at the time of his visit with the plaintiffs.
- After van Belle allegedly gave Nielsen "authorization" to purchase the ONP, several faxes between van Belle and Nielsen indicated that Nielsen, in fact, was not authorized to purchase the ONP. In these faxes, Nielsen acknowledged that they did not reach an agreement on price. Nielsen faxed van Belle stating, "I need your okay on price to move ahead [with the purchases of ONP and other waste paper]." A few days later, Nielsen

faxed van Belle writing, "I need your okay to proceed." Again, a few days later, Nielsen faxed van Belle requesting "the go ahead on purchasing all of the ONP .... You have to let me buy all the paper that I can get my hands on."

- When Nielsen ordered the ONP, he used "dummy" order numbers. He did not use order numbers authorized by defendants, as is customary.
- On June 6, van Belle reaffirmed KNP's interest in ONP, but complained about Nielsen's price.
- Later on June 6, Nielsen informed van Belle that he purchased over 16,000 tons of ONP and requested that van Belle confirm the order.
- On June 8, van Belle stated that KNP was no longer interested in certain types of ONP and, again, complained about the price.
- van Belle ultimately rejected Nielsen's offer to sell ONP due to its high price.

Further, defendants contend that most of the plaintiffs understood that (1) N & N was a reputable company which routinely ordered significant tonnage of waste paper; (2) N & N was their customer, not KNP or KNP Recycling; (3) plaintiffs expected payment was from N & N, not KNP or KNP Recycling.

### DISCUSSION

### III. Standard

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *See Meyer v.*

---

11. By no means is this to be construed as defendants' entire factual record.

*Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir. 1989).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *See id.* Conversely, if a reasonable trier of fact could find for the non-moving party, the Court must deny summary judgment. *See id.*

When the non-moving party bears the burden of proof at trial, the moving party's burden can be "discharged by 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

Further, when a non-moving party who bears the burden of proof at trial has failed, in opposition to a motion for summary judgment, to raise a disputed fact issue as to any essential element of his or her claim, summary judgment should be granted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

In opposing summary judgment, a nonmovant may not "rest upon mere allegations, general denials, or … vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.), *cert. denied*, 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) ("unsupported allegations in [a nonmovant's] memorandum and pleadings are insufficient to repel summary judgment"); *see* Fed. R.Civ.P. 56(e). The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

An affidavit filed in opposition to a properly-supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A non-movant "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888, 110 S.Ct. 3177. The Court is not to presume the existence of specific facts from general averments. *See id.* Such an affidavit must: (1) "show affirmatively that the affiant is competent to testify to the matters stated therein;" (2) be based on "personal knowledge;" and (3) establish facts that "would be admissible at trial." Fed.R.Civ.P. 56(e); *see Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 282 (3d Cir.1988). In sum, an affidavit offered in opposition to a motion for summary judgment must establish a proper evidentiary foundation for the facts stated within it.

*See Williams v. Borough of West Chester,* 891 F.2d 458, 471 (3d Cir.1989) (Garth, J., concurring).

## IV. Breach of Contract and Related Claims

It is undisputed that plaintiffs contracted with N & N—indeed, (1) N & N issued purchase orders to each plaintiff, and (2) each plaintiff shipped ONP pursuant to the orders. It also appears to be undisputed that the contract was breached—(3) plaintiffs never received payment.

Plaintiffs argue that, in each transaction, N & N acted as defendants' agent. Thus, plaintiffs conclude that defendants should be liable, in breach of contract, for non-payment of the ONP.

Defendants disagree; they contend that N & N had no authority to act as defendants' agent. Instead, defendants assert that plaintiffs only contracted with N & N who had no authority to bind defendants. Thus, liability rests with N & N alone.

As discussed below, however, plaintiffs offer sufficient evidence in which a reasonable juror could conclude that N & N had (1) actual authority to contract for defendants and/or (2) apparent authority to contract for defendants, thus, subjecting defendants to liability for breach of contract.

### A. Agency

Agency is the fiduciary relation in which an agent acts on behalf of his principal. *See* Restatement (Second) of Agency § 1 (1958). An agent must have "authority" to act for the principal. Such authority may be "actual" or "apparent." *See Sears Mortgage Corp. v. Rose,* 134 N.J. 326, 338, 634 A.2d 74 (1993); Restatement (Second) of Agency §§ 7–8. A principal will be found liable for his agent's actions only when the agent acts with "authority."

**12.** Indeed, once a principal grants an agent express authority, the principal's agent often

### 1. Actual Authority

█ Actual authority is the authority that a principal expressly or implicitly gives an agent. *United States v. Martinez,* 613 F.2d 473, 481 (3d Cir.1980); *Reynolds Offset Co. v. Summer,* 58 N.J.Super. 542, 156 A.2d 737 (App.Div.1959). It may be determined by the principal's "manifestation of consent" to the agent. *See* Restatement (Second) of Agency § 7. A principal manifests consent when an agent "is reasonable in drawing an inference that the principal intended him [to be authorized]." *Id.* § 7 cmt. b., § 26.

Actual authority may either be "express" or "implied." *See Reynolds Offset Co. v. Summer,* 58 N.J.Super. 542, 557, 156 A.2d 737 (App.Div.1959) (quoting *Carlson v. Hannah,* 6 N.J. 202, 212, 78 A.2d 83 (1951)). Express authority is manifested through the principal's words or other conduct. *See* Restatement (Second) of Agency § 26. In such instances, a principal "specif[ies] minutely what the agent is to do." *Id.* § 7 cmt. c.

█ Most actual authority, however, is created by implication. Such "implied authority" is "incidental to a grant of express authority."[12] *Thomas v. I.N.S.,* 35 F.3d 1332, 1338 (9th Cir.1994) (quoting W. Edward Sell, Sell on Agency 25–31 (1985)). For the most part, an agent has implied authority to undertake all transactions necessary to fulfill the duties required of an agent in exercise of express authority. *Id.; Migerobe, Inc. v. Certina USA, Inc.,* 924 F.2d 1330 (5th Cir.1991); *Amvest Capital Corp. v. Banco Exterior de Espana, S.A.,* 675 F.Supp. 640, 643 (S.D.Fla.1987); *Reynolds Offset Co. v. Summer,* 58 N.J.Super. 542, 156 A.2d 737 (1959). Such authority is gleaned "from the words used, from customs and from the relations of the parties." Restatement (Second) of Agency § 7 cmt. c; *see also Sears Mortg. Co. v. Rose,* 134 N.J. at 338, 634 A.2d 74 ("Implied authority may be inferred from the

receives implied authority, as well.

nature or extent of the function to be performed, the general course of conducting the business, or from particular circumstances in the case.")

For example, if a principal instructs his agent to buy a certain piece of property, the agent possesses express authority—the power to dispense cash for the property. The agent may also be given additional authority not explicitly expressed. Indeed, the agent may receive "implied authority" to lease the property or buy on credit. *See* Restatement (Second) of Agency § 7 cmt. c.

■ In the present case, the Court finds genuine issues of facts regarding whether N & N possessed actual authority to purchase ONP. Nielsen testified that van Belle granted N & N authorization to purchase specified tonnage of plaintiffs' ONP from the plaintiffs. A reasonable interpretation of such evidence indicates that defendants—through their words and conduct—expressly manifested consent to have N & N act as its agent regarding the purchase of the ONP. *See id.* § 26 ("[actual] authority can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.").

Accordingly, a reasonable juror could conclude that N & N acted with both express authority—van Belle's express manifestation of authority empowering N & N to buy ONP—and implied authority—the alleged agent's power to undertake transactions necessary to purchase the ONP. Consequently, a reasonable juror could conclude that N & N's non-payment is tantamount to a breach by defendants. *See id.* § 50 ("[A]uthority to make a con-

tract is inferred from authority to conduct a transaction, if the making of such a contract is incidental to the transaction, usually accompanies such a transaction, or is reasonably necessary to accomplish it.").

■ Defendants argue that they cannot be found liable under an actual agency theory because N & N did not refer to the principal—defendants KNP or KNP Recycling—in their purchase orders for ONP. Such a fact, however, does not protect a principal from liability. Indeed, a "principal is subject to liability upon an authorized contract in writing [even if] it purports to be the contract of the agent." [13] *Id.* § 149.[14] Thus, defendants may be found liable regardless of whether the purchase orders name the defendants, so long as defendants authorized N & N to purchase the ONP.

### 2. Apparent Authority

■ In addition to actual authority, triable issues of fact exist as to whether N & N had apparent authority. "Apparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority." [15] *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1439 (3d Cir.1994) (quoting *Barticheck v. Fidelity Union Bank/First Nat'l State*, 680 F.Supp. 144, 148–49 (D.N.J.1988) (Wolin, J.)). Apparent authority imposes liability on the principal because the principal's actions have "misled" a third-party into believing that an "agent" has authority to act for the principal. *See Mercer v. Weyerhaeuser Co.*, 324 N.J.Super. 290, 317, 735 A.2d 576 (App. Div.1999) (citing *Blaisdell Lumber Co. v.*

---

**13.** According to the Restatement (Second) of Agency, the principal must be disclosed. Here, the plaintiffs' evidence suggests that defendants were disclosed.

**14.** New Jersey tends to follow the Restatement.

**15.** The Restatement (Second) of Agency states that "[a]pparent authority is the power to affect the legal relations of another person by transactions with third person, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third person." Restatement § 8; *see also Sears,* (quoting Restatement § 8).

*Horton*, 242 N.J.Super. 98, 102–03, 575 A.2d 1386 (App.Div.1990)).

■ Whether an agent is cloaked with apparent authority is a factual question. *See, e.g., Gizzi v. Texaco, Inc.*, 437 F.2d 308, 310 (3d Cir.1971). The often stated question for the trier of fact is whether the

> principal, by his voluntary actions, placed the agent in such a situation that a person of ordinary prudence, conversant with general business practice, is justified in believing that the agent had authority to perform the act in question.

*See, e.g., Newark Branch, NAACP v. Township of West Orange, N.J.*, 786 F.Supp. 408, 424 (D.N.J.1992); *Mercer*, 324 N.J.Super. at 318, 735 A.2d 576. In other words, the plaintiff must establish: (1) that the conduct of the alleged principal created the appearance of authority; and (2) that a third party reasonably relied on the agent's apparent authority to act for a principal.[16]

■ Defendants argue that no reasonable juror could find that N & N had apparent authority. Primarily, defendants focus upon the second element which deals with plaintiffs' purported reliance upon defendants' conduct.

Clearly factual issues exist as to the first element of apparent authority—whether the defendants' conduct created the appearance of authority in N & N. According to plaintiffs' evidence, van Belle told every plaintiff that, with regards to the acquisition of substantial tonnage of ONP, N & N was defendants' "exclusive purchasing agent." Similarly, van Belle stated to some plaintiffs that N & N would issue purchase orders on behalf of defendants.

van Belle also directed some plaintiffs to deal only with N & N concerning such shipments to defendants. Without question, such evidence indicates that defendants created an appearance of authority in N & N.

The more disputed issue involves the second element—whether plaintiffs reasonably relied upon defendants' conduct. Yet, despite this dispute, sufficient evidence is present to preclude summary judgment. *See Mercer*, 324 N.J.Super. at 318–21, 735 A.2d 576.

Here, every plaintiff testified that they relied on the appearance of authority. They state that they would not have entered into the transaction but for defendants' participation.

A reasonable juror could find such reliance reasonable under the circumstances. *See id.* Indeed, several pieces of plaintiffs' evidence would warrant such a finding. Plaintiffs only secured and shipped waste paper after meeting with defendants. At these meetings, defendants indicated that it sought substantial tonnage of ONP. After informing plaintiffs that they sought the ONP, defendants informed plaintiffs that they wanted to buy it from the plaintiffs through its agent, N & N. Plaintiffs, subsequently, looked into defendants' reputation and ability to pay. Plaintiffs reviewed defendants financial records and other business information. Only then, after learning that N & N was defendants' "agent" and after looking into defendants' ability to pay for an above average order of ONP, did plaintiffs ship the ONP. Such evidence, the Court finds, precludes a grant of summary judgement.[17] *See id.*

---

**16.** Note that some cases require the plaintiff to prove three elements: (1) conduct created the appearance of authority; (2) reliance; (3) reliance must be reasonable. *See, e.g., Mercer*, 324 N.J.Super. at 318, 735 A.2d 576. The Court condenses the second and third element into one: reasonable reliance.

**17.** Defendants cite to *N. Rothenberg & Son, Inc. v. Nako*, 49 N.J.Super. 372, 139 A.2d 783 (App.Div.1958). In that case the court held

that "where the facts show that the third person in dealing with the putative agent is utterly indifferent to the existence of a principal, and rather indicates that the dealings are with the putative agent as principal, no liability can be fashioned against one who later may appear by circumstances to be in a possible position of 'apparent or ostensible' principal." *Id.* at 382, 139 A.2d 783. This statement merely restates the "reliance" requirement. Indeed, if one does not rely on the agent's

(finding a "serious factual dispute" as to reasonable reliance where the plaintiffs testified that they entered transactions due to the alleged principal's "good reputation").

■ Defendants, however, argue that reliance was unreasonable under the circumstances. Defendants maintain that an ordinary person conversant with general business practice would not believe that N & N had authority to form a contract on behalf of defendants.

Defendants' argument hinges upon three pieces of evidence: (1) no purchase order indicated that defendants were a contracting party; (2) the plaintiffs did not expect payment directly from defendants—instead, they expected it from N & N; and (3) the shipping documents did not list defendants. In light of these facts, according to defendants, anyone familiar with this type of business practice would not believe that N & N was defendants' agent.

Such evidence may weigh upon the reasonableness of plaintiffs' reliance. Yet, the Court does not weigh the evidence in a summary judgment motion. Indeed, "a court's role at the summary judgment stage is merely to identify factual issues, not to weigh the credibility or strength of the evidence. That task must be left to the jury." *Farmers & Merchants Nat'l Bank v. San Clemente Financial Group Secs., Inc.,* 174 F.R.D. 572, 579 (D.N.J. 1997). As noted above, a reasonable juror could conclude that plaintiffs did, in fact, reasonably rely upon defendants' conduct. Indeed, a finding of such reliance is, in part, supported by plaintiffs' inquiry into defendants' business and financial records. Of course, such a finding is not necessitated by this evidence. Indeed, in light the facts proffered by defendants, a reasonable juror could find otherwise. Such is the

essence of a factual dispute. Thus, in this case, the Court finds that genuine issues of fact exist concerning reliance.[18] *See also Mann v. Interstate Fire & Cas. Co.,* 307 N.J.Super. 587, 595–96, 705 A.2d 360 (App. Div.1998) (finding that when a party presents evidence that he relied on an alleged apparent authority, "he is entitled to have the question submitted to the jury") (quoting *American Well Works v. Royal Indemn. Co.,* 109 N.J.L. 104, 108, 160 A. 560 (1932)).

### 3. Restatement (Second) of Agency Section 14K.

■ Defendants, in arguing that the Court should grant summary judgment, cite to the Restatement (Second) of Agency Section 14K ("14K"). Defendants' argument is unavailing.

This section provides guidance in determining whether a reseller of property is an agent or merely a seller of that property. Under 14k, "[o]ne who contracts to acquire property from a third person and convey it to another is the agent of the other only if it is agreed that he is to act primarily for the benefit of the other and not for himself." The comment to this section explains:

> Factors indicating that one who is to acquire the property and transfer it to the other is selling to, and not acting as agent for, the other are: (1) That he is to receive a fixed price for the property, irrespective of the price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer. (3) That he has an independent business in buying and selling similar property. None of these factors is conclusive.

appearance of authority, the agent has no apparent authority to act. Hence, no additional analysis is necessary because the Court finds factual issues exist as to whether plaintiffs reasonably relied upon N & N's appearance of authority.

**18.** Defendants offer other evidence, as well. The Court is convinced that such evidence merely weighs against the plaintiffs' evidence.

Restatement (Second) of Agency § 14k cmt. a.

Defendants appear to offer evidence that meets each of these factors. Of course, the trier of fact must weigh the § 14K factors in determining whether an agency relationship exists. Nevertheless, a reasonable juror, despite the presence of these factors, may ultimately find that N & N acted as defendants' agent. Because "[n]one of these factors are conclusive," the jury may find an agency relationship existed based upon other factors—specifically, plaintiffs' evidence discussed above. Indeed, as discussed extensively above, the plaintiffs have presented sufficient evidence supporting the prima facie elements of agency.[19] *See supra.* Accordingly, the Court is compelled to deny summary judgment.[20]

### B. Related Issues

Plaintiffs assert two claims which are related to the breach of contract claims. First, they claim that defendants violated the covenant of good faith and fair dealing. Second, they advance a promissory estoppel claim.

### 1. Good Faith and Fair Dealing

■■■■■ In New Jersey, "every contract contains an implied covenant of good faith and fair dealing." *Woods Corporate Associates v. Signet Star Holdings, Inc.,* 910 F.Supp. 1019, 1034 (D.N.J.1995) (quoting *Association Group Life, Inc. v. Catholic War Veterans,* 61 N.J. 150, 153, 293 A.2d 382 (1972)); *see also Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 420, 690 A.2d 575 (1997). "The covenant provides that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Woods Corporate Associates,* 910 F.Supp. at 1034 (quoting *Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 130, 207 A.2d 522 (1965)). According to the New Jersey Supreme Court, the covenant may be breached even if the defendant's acts "[do] not literally violate" the agreement in issue, *Catholic War Veterans,* 61 N.J. at 153, 293 A.2d 382, if a party to the contract engages in some behavior "not contemplated by the spirit of the contract." *Id.*

■■■■ Defendants argue that the claim for breach of the covenant of good faith and fair dealing must be dismissed. Citing New York law, defendants assert that the claim duplicates the breach of contract claims, thus, requiring dismissal.

The Court is not convinced that New Jersey law requires dismissal for "duplicated" claims. Nevertheless, plaintiffs' claim is not duplicative. Plaintiffs submit evidence that defendants violated the covenant by failing "to notify plaintiffs that [defendants'] relationship with [N & N] had materially changed." Such an allegation is different than their breach of contract claim. Indeed, it may "not literally violate" the agreement; it may, however, violate the covenant. Indeed, withholding such information may have "injure[d] [plaintiffs'] right ... to receive the fruits of the contract." *Palisades Properties, Inc.,* 44 N.J. at 130, 207 A.2d 522. Accordingly, the Court will deny summary judgment.[21]

### 2. Promissory Estoppel

■■■■ Plaintiffs also allege a claim for promissory estoppel. Under New Jersey

19. Again, the Court must not weigh evidence in summary judgment motions. To do so would inappropriately intrude on to the realm of the jury.

20. In their brief, plaintiffs contend that defendants contracted directly with plaintiffs—not through its alleged agent. Plaintiffs claim these contracts were "committed contracts." The Court need not address this argument because plaintiffs failed to make any such allegation in their Second Amended Complaint. All breach of contract claims alleged in the Second Amended Complaint are based upon agency theory.

21. Of course, if it is later determined that no contract exists between plaintiffs and defendants, this claim must fall.

law, the elements of a promissory estoppel claim are: (1) a clear and definite promise; (2) the promise is made with the expectation that the promisee will rely on it; (3) the promisee in fact reasonably relies on the promise; and (4) the promisee suffers a definite and substantial detriment as a result of the reliance such that the promise should be enforced to avoid injustice. *See Aircraft Inventory Corp. v. Falcon Jet Corp.*, 18 F.Supp.2d 409, 416 (D.N.J.1998); *Fischer v. Allied Signal Corp.*, 974 F.Supp. 797, 809 (D.N.J.1997); *Royal Assocs. v. Concannon*, 200 N.J.Super. 84, 91, 490 A.2d 357 (App.Div.1985).

Plaintiffs allege that van Belle's representations to the plaintiffs were made to induce action on the part of plaintiffs and did induce such action. According to the plaintiffs, defendants failed to fulfill their promises to the plaintiffs, as a result of which each of the plaintiffs suffered damages, and "injustice can be avoided only by enforcement of the promises."

■ This claim fails on the first element. Plaintiffs point to no "clear and definite promise" made by van Belle.[22] Instead, plaintiffs point to many alleged misrepresentations made by van Belle. They fail, however, to single out a concrete promise. Arguably, one could imply a promise through the conduct engaged by the parties. The Court, however, "do[es] not regard this kind of implied undertaking ... as the "clear and definite promise" that is required as an adequate foundation for [promissory estoppel]." *Malaker Corp. v. First Jersey Nat'l Bank*, 163 N.J.Super. 463, 480, 395 A.2d 222 (App.Div.1978). Hence, because the "promise" upon which plaintiffs relied was not sufficiently clear and definite, the Court must grant summary judgment. *See id.* at 479, 395 A.2d 222 (finding that a clear and definite promise is the "sine qua non for applicability of this theory of recovery").

## V. Fraud

Plaintiffs allege that defendants engaged in a fraudulent scheme to drive down the market price of ONP and other waste paper. The gravamen of plaintiffs' claim is as follows:

- Defendants ordered shipments of ONP through N & N, with a plan to reject the shipments once they arrived in Europe.
- This created a false demand for the ONP.
- When the false demand was removed, the price collapsed.
- The rejection of these shipments also caused a supply "glut" of ONP.
- This supply "glut" of "distressed" tonnage also caused worldwide ONP prices to fall, though not as quickly and not as much as the false demand.
- After the market crashed, defendants then purchased ONP at reduced prices.

As a result of this conduct, plaintiffs assert that defendants are liable under a legal fraud theory.

■ To state a claim for actionable legal fraud, New Jersey law requires plaintiffs to prove each of the following elements: (1) a material misrepresentation of a present or past fact (2) with knowledge of its falsity (3) with the intention that the other party rely thereon (4) which resulted in reasonable reliance by the other party. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182 (3d Cir.1993).

Defendants argue that plaintiffs failed to present any material issues of fact regarding this fraudulent scheme. In fact, they maintain that plaintiffs raised no factual issue as to any element of the claim.

Despite the weight of defendants' evidence, the Court finds that plaintiffs have presented enough evidence of material questions of fact to survive the summary judgment hurdle.

22. Significantly, plaintiffs' claim does not include any promises made by defendants' alleged agent, N & N. It only includes van Belle's representations and conduct.

■ Before the Court engages in its analysis, the Court notes that defendants, in their reply brief, misstate the burden of proof. Plaintiffs must only prove their claim of legal fraud by a preponderance of the evidence, not by clear and convincing evidence. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182 (3d Cir. 1993). Indeed, as the Third Circuit noted in *Lightning Lube, Inc.*, "a plaintiff asserting a claim of legal fraud ... only need prove the elements of fraud by a preponderance of the evidence." *Id.* at 1182. Where, as here, "a plaintiff alleges fraud to recover money damages, the fraud is legal in nature." *Marsellis–Warner Corp. v. Rabens*, 51 F.Supp.2d 508, 521 n. 11 (D.N.J.1999).

## A. Knowing Misrepresentation

Plaintiffs allege that defendants knowingly misrepresented their interest in the ONP—specifically, that defendants would buy 40,000 tons per month through their "agent," N & N.[23] As discussed below, the same material facts satisfy the first two elements—(1) material misrepresentation which was (2) made knowingly.

■ To establish a material misrepresentation, plaintiffs must show more than mere nonperformance. Indeed, "[s]tatements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." *Alexander v. CIGNA Corp.*, 991 F.Supp. 427, 435 (D.N.J.1998). If, however, "a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement of present fact and may support an allegation of fraud." *Lo Bosco v. Kure Engineering Ltd.*, 891 F.Supp. 1020, 1031 (D.N.J.1995) (Wolin, J); *see also Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J.Super. 452, 457, 489 A.2d 1209 (App.Div.1985) ("A promise to pay in the future is fraudulent if there is no present intent ever to do so.").

Clearly, plaintiffs present enough evidence to survive this motion with regard to the first element—the material misrepresentation. At the May 3 meeting, defendants resolved to refrain from purchasing ONP from the United States.[24] Yet, after that meeting, defendants, through van Belle and N & N,[25] indicated to plaintiffs that it would purchase the ONP. Indeed, van Belle informed plaintiffs that: defendants sought 40,000 tons per month of ONP and other waste paper; defendants would pay slightly higher than market price; defendants would take any additional tonnage of ONP that plaintiffs could produce; and N & N, as defendants' agent, was to order and purchase the ONP and other waste paper. Subsequently, N & N ordered the ONP. Thus, without doubt, a reasonable inference can be drawn that defendants' knew the represen-

---

**23.** Plaintiffs contend that several representations made by van Belle were false. Specifically, plaintiffs point to van Belle's representations concerning defendants desire to purchase 40,000 tons of ONP per month. Plaintiffs offer evidence of the following: van Belle informed plaintiffs that defendants sought 40,000 tons of ONP per month; defendants would pay slightly higher than market price; defendants would take any additional tonnage of ONP that plaintiffs could produce; N & N, as agent, was to order and purchase the ONP. Afterward, N & N ordered the ONP.

**24.** While the minutes of the May 3 meeting may be subject to different interpretations as to whether defendants did, in fact, determine to buy no more ONP from the United States, clearly, the inference noted here is reasonable. *See supra.*

**25.** Defendants' use of N & N to accomplish the fraud is of no import. Indeed, "where it is shown that plaintiff was induced by defendants' misrepresentation to deal with a third party," an action for fraud will lie. *Grow Farms Corp. v. National State Bank*, 167 N.J.Super. 102, 107, 400 A.2d 535 (1979). Plaintiffs offer sufficient evidence which demonstrates that they were induced to deal with N & N.

tations to be false when made.[26] *See Lo Bosco*, 891 F.Supp. at 1031. Indeed, after the May 3 meeting, defendants knew they had no intention of purchasing the ONP but, nevertheless, made contrary representations to the plaintiffs. Accordingly, this constitutes a material misrepresentation. *See id.* Obviously, the same evidence demonstrates the second element—whether defendants knew the representations to be false.

## B. Intention that Plaintiffs Rely upon the Misrepresentation

■ To satisfy the intent element of a fraud claim, a plaintiff must prove that a defendant sought "to obtain an undue advantage [from his misrepresentation]."[27] *First Valley Leasing, Inc. v. Goushy*, 795 F.Supp. 693, 701 (D.N.J.1992); *see also Jewish Center v. Whale*, 86 N.J. 619, 624–25, 432 A.2d 521 (1981). In the context of the instant case, the "undue advantage" is the manipulated low price of ONP. Accordingly, plaintiffs must prove that defendants intended "to obtain an undue advantage,", i.e., a low price of ONP, through the alleged misrepresentations which caused plaintiffs to ship the ONP.

■ To prove that defendants intended to reduce the price of the ONP through

misrepresentations, plaintiffs present circumstantial evidence of the alleged scheme to lower prices. Further, they attempt to show how these misrepresentations aided in that scheme.[28] The scheme and plaintiffs' proofs of it are as follows.

First, plaintiffs point to the extraordinarily high prices of ONP. Unsurprisingly, these high prices hampered defendants' business and constrained their profits. While the prices were high, defendants engaged in the alleged misrepresentations which caused plaintiffs to ship the ONP.

According to plaintiffs' expert,[29] this skewed the market; it created a false appearance of a high demand for ONP from the United States. (Moore Report at 29–34). Such a demand raised the ONP prices. (*Id.*). After plaintiffs learned that defendants would not accept the shipments, the false appearance of demand lifted. (*Id.*). According to the expert, removing this demand lowered prices considerably. (*Id.*) Indeed, it lowered prices "by at least $32 a ton more than it would have had ordinary market conditions prevailed."[30] (*Id.* at 21). In addition, plaintiffs' expert testified that the "distressed tonnage" also caused the global market

---

**26.** Even if van Belle, himself, did not know the representations were false, plaintiffs still satisfy this element. This is so because plaintiffs offer evidence which demonstrates that van Belle's superior—Vermeulen, who was present at the May 3 meeting, still instructed van Belle to make such representations. He did so even though he knew that defendants had no "intention" of making such purchases.

Moreover, even if defendants only later discovered their statements were false, they may still be liable for fraud. Indeed, where a person makes a false representation in good faith, but later discovers it is false, he must correct the misrepresentation. If he does not, he may be liable. *Schillaci v. First Fidelity Bank*, 311 N.J.Super. 396, 404, 709 A.2d 1375 (App.Div.1998) (citing *Brown v. Honiss*, 74 N.J.L. 501, 508–509, 68 A. 150) (1907).

**27.** The intent element is part of the "scienter" element. In equitable fraud, unlike legal fraud, a plaintiff need not prove scienter—

that is, he need not prove (1) knowledge and (2) intent. *See Jewish Center*, 86 N.J. at 624–24, 432 A.2d 521. As discussed above, plaintiffs present sufficient evidence of a factual dispute as to both requirements.

**28.** Defendants appear to argue that circumstantial evidence is inadequate. Yet, plaintiffs need not present direct evidence of fraudulent intent, as defendants suggest. Circumstantial evidence is sufficient. *See Stochastic Decisions, Inc. v. DiDomenico*, 236 N.J.Super. 388, 396, 565 A.2d 1133 (1989).

**29.** Also before the Court is a motion *in limine* to disqualify the expert. The Court makes no ruling at this time as to the admissibility of the expert's report and testimony.

**30.** Moreover, "the market price is often driven by rumor and innuendo, [thus] hav[ing] an exponential multiplier effect on market prices." (Moore Report at 31).

price to drop, though not as quickly and not as much. (Moore Tr. 725–30).

Before the price collapsed, defendants reduced their waste paper inventory to one week's supply. (Vermeulen Ex. CJ). After the collapse, plaintiffs offer evidence that defendants proposed to "purchase and store approximately 50,000 tons of waste paper." (Vermeulen Ex. AB—minutes of a KNP Recycling meeting).

The inference to be drawn from these facts is that defendants intended to lower ONP prices through their alleged misrepresentation. The Court is persuaded that a reasonable juror could make such an inference.

Defendants offer evidence that would lead to a contrary inference. For instance, defendants point out that, through a series of faxes, they eventually instructed N & N not to purchase the ONP. Certainly, this fact could lead a juror to believe that defendants did not have the requisite intent.[31] Additionally, defendants take issue with plaintiffs' interpretation of the evidence and the inferences they make; indeed, they offer reasonable, alternative inferences. The Court, however, is satisfied that defendants' evidence merely weighs against the plaintiffs' evidence.[32] Again, in the context of summary judgment, the Court will not weigh the evidence, even if it believes one's evidence to be stronger.

Defendants also claim that they, in fact, lost money due to the collapse in ONP prices. This evidence, defendants maintain, leads to an inference that they did not scheme to lower prices. Such evidence, however, is not dispositive. Indeed, a reasonable juror may infer otherwise. While defendants may not have intended to lose money, the result of an alleged scheme may not always be the result intended at the outset.[33]

## C. Reasonable Reliance

▇ Lastly, the Court finds a genuine issue of material fact regarding the fourth element—reasonable reliance. All plaintiffs, in their affidavits, stated that they relied upon defendants' misrepresentations that it sought to order ONP. Each plaintiff shipped the waste paper believing that KNP was a reputable company, one that would honor its representations. Furthermore, the plaintiffs testified that they would not have shipped such a large volume, absent van Belle's statements. This testimony is bolstered by the actions of some plaintiffs. Indeed, some plaintiffs researched defendants' financial information and business records apparently to determine the financial standing and reputation of defendants.[34] Only then did they ship the ONP. *See Van Dam Egg Co.*, 199 N.J.Super. at 458, 489 A.2d 1209 ("[I]t is a fact question, in every case in which it is disputed, whether the [plaintiff] did rely, and if so whether the reliance was justifiable."); *see also Union Trust Co. of Maryland v. Wakefern Food Corp.*, CIV. No.

---

31. Defendants further argue that no action by the defendants induced Nielsen to order the waste paper. While defendants offer credible evidence, they ignore plaintiffs' evidence. Indeed, plaintiffs put forward testimony indicating that van Belle authorized N & N to purchase the ONP. This, in the Court's view, constitutes an inducement to purchase the ONP. Thus, a genuine issue of material fact exists.

32. Indeed, defendants offer alternative inferences which could be made regarding the minutes of the May 3 meeting and Vermeulen's testimony. Nothing, however, warrants a finding that, as a matter of law, defendants' interpretation is correct.

33. Lastly, defendants contend that the alleged scheme theory defies common sense. In doing so they cite to "basic economic theory." Under "basic economic theory," defendants maintain that prices would not fall considerably. Plaintiffs' expert appears to indicate otherwise. Indeed, Moore testified that defendants actions would lower the price. If true, then, clearly, the theory does not defy common sense. As noted above, the Court makes no opinion, at this time, regarding the admissibility of Moore's testimony.

34. Defendants present credible evidence which contradicts the plaintiffs testimony. Yet, again, such evidence is insufficient in granting summary judgment.

86–728, 1989 WL 120756, at \*25 (D.N.J. Sept.8, 1989) (finding that credibility determinations regarding reasonable reliance must be made by the trier of fact). Thus, if plaintiff succeeds in convincing a jury that, inter alia, their reliance was reasonable, then there is sufficient evidence in the record for the jury to so conclude.

Accordingly, the Court must deny defendants' summary judgment motion regarding the claim of legal fraud. *See Van Dam Egg Co. v. Allendale Farms, Inc.,* 199 N.J.Super. 452, 458, 489 A.2d 1209 (App. Div.1985). Genuine issues of material fact are present with regard to each and every element of the claim.

### VI. KNP is Properly Before the Court

Defendants make one last argument. They maintain that the claims against KNP should be dismissed because plaintiffs cannot "pierce the corporate veil" between KNP and KNP Recycling.

The Court finds, however, that KNP is properly before the Court. The Court does so, partly, under the principles of agency.

■ According to the Third Circuit, without piercing the corporate veil, a parent corporation may still be held liable. *Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466 (3d Cir.1988). It may be held liable under

> an application of general agency principles. One corporation whose shares are owned by a second corporation does not, by that fact alone, become an agent of the second company. However, one corporation—completely independent of a second corporation—may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting.

*Phoenix Canada Oil Co.,* 842 F.2d 1466 (3d Cir.1988) (citations omitted).

■ As noted above, an agent may act under either actual authority or apparent authority. *See Sears Mortgage Corp.,* 134 N.J. at 337–38, 634 A.2d 74. The record contains sufficient evidence for a reasonable juror to find that KNP Recycling was KNP's agent.

Plaintiffs offer the following evidence. KNP created KNP Recycling, with the corporate purpose to supply raw materials to KNP. The KNP annual report indicates that KNP Recycling was merely a "division," not a separate corporation. van Belle's business card, which van Belle gave to the plaintiffs, identified KNP Recycling as a "KNP" company. During negotiations with plaintiffs, van Belle proposed business ventures in which KNP—not KNP Recycling—would supply an equity investment.

Such evidence, viewed in light most favorable to the plaintiffs, suggests an agency relationship. Indeed, under the totality of the circumstances, a reasonable juror could conclude that KNP Recycling (and its employees, such as van Belle), acted with apparent authority.

Plaintiffs met both elements of apparent authority. First, KNP's conduct established the appearance of authority in KNP Recycling. Specifically, KNP created KNP Recycling with the purpose of acquiring material through KNP Recycling; it merely listed KNP Recycling as a division—not a separate corporation—in its annual report; it apparently permitted van Belle, on his business card, to depict himself as an employee of "KNP;" and one can infer that it apparently gave van Belle permission to negotiate, on its behalf, with plaintiffs regarding possible business ventures. Thus, one can reasonably infer that KNP created the appearance of authority in KNP Recycling and van Belle.

Second, a reasonable juror could find that plaintiffs reasonably relied on such appearance of authority. As discussed at

length above, plaintiffs offered evidence indicating that they would not have shipped the ONP absent KNP's presence in the transaction. Indeed, they present evidence suggesting that they relied on KNP's reputation as a reputable company within the waste paper business community. *See Mercer*, 324 N.J.Super. at 319, 735 A.2d 576.

 Accordingly, KNP is properly before the Court. Indeed, it can be found liable for the actions of its agents.[35]

## CONCLUSION

For the above stated reasons, the Court will deny defendants' summary judgment motion to dismiss plaintiffs' breach of contract claims. The Court will grant defendants' summary judgment motion to dismiss plaintiffs' promissory estoppel claim. The Court will deny defendants' summary judgment motion to dismiss plaintiffs' breach of the implied covenant of good faith and fair dealing claim. The Court will deny defendants' summary judgment motion to dismiss plaintiffs' fraud claim. The Court will deny defendants' summary judgment motion to dismiss all claims against defendant KNP.

An appropriate Order is attached.

### *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 23d Day of December, 1999

ORDERED that defendants' summary judgment motion to dismiss plaintiffs' breach of contract claims is denied; and it is further

ORDERED that defendants' summary judgment motion to dismiss plaintiffs' promissory estoppel claim is granted; and it is further

ORDERED that defendants' summary judgment motion to dismiss plaintiffs' breach of the implied covenant of good faith and fair dealing claim is denied; and it is further

ORDERED that defendants' summary judgment motion to dismiss plaintiffs' fraud claim is denied; and it is further

ORDERED that defendants' summary judgment motion to dismiss all claims against defendant KNP is denied.

---

[35.] With regards to the fraud claim, KNP is also a proper party before the Court. As discussed at length above, the record contains evidence in which a reasonable juror could infer that KNP was a direct actor in the fraud. Thus, if it is later determined that KNP Recycling was not KNP's "agent," KNP's presence before the Court may be proper with regard to the fraud claim.