SYLVAN LEARNING SYSTEMS,
INC. Plaintiff,

v.

Irwin GORDON, Federal Insurance Company, Chubb Insurance Company of New Jersey, Chubb & Son, Inc., Cornwall & Stevens Northeast, Inc. and Universal Bonding Insurance Company, Defendants.

No. CIV. A. 98–2146 AJL.

United States District Court,
D. New Jersey.

Nov. 15, 2000.

John D. Corse, Piper Marbury Rudnick & Wolfe LLP, New York City, for Plaintiff.

Kevin J. McKenna, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, PC, Newark, NJ, for Defendants Federal Insurance Company, Chubb Insurance Company of New Jersey and Chubb & Sons, Inc.

Thomas M. Rittweger, Nicoletti Hornig & Sweeney, Hackensack, NJ, for Defendant Cornwall & Stevens Northeast, Inc.

Ronald E. Wiss, Wolff & Samson, Roseland, NJ, for Defendant Universal Bonding Insurance Company.

Irwin Gordon, Hackensack, NJ, Pro se Defendant.

## OPINION

LECHNER, District Judge.

This is an action by plaintiff Sylvan Learning Systems, Inc. ("Sylvan") against defendants Irwin Gordon ("Gordon"), Federal Insurance Company, Chubb Insurance Company of New Jersey, Chubb & Son, Inc. (collectively, "Chubb"), Cornwall & Stevens Northeast, Inc. ("Cornwall") and Universal Bonding Insurance Company ("Universal") (collectively, the "Defendants"). In an amended complaint (the "Amended Complaint"), filed 30 October 1998, Sylvan alleged Gordon, an insurance/bond broker, defrauded its corporate predecessors, I–R, Inc. and Independent Child Study Team, Inc. (collectively, "Educational Inroads"), by improperly inflating premiums on various insurance policies and bonds purchased by Educational Inroads. Amended Complaint, ¶¶ 25–27. Sylvan has alleged that Gordon was the statutory and common law agent of Chubb, Cornwall and Universal and, therefore, Chubb, Cornwall and Universal are liable for the alleged improprieties of Gordon. Id., ¶¶ 28–92. In addition, Sylvan has alleged that Chubb, Cornwall and Universal were negligent in failing to properly supervise Gordon. Id., ¶ 49.

Presently pending is a motion by Chubb and Cornwall for summary judgment (the "Joint Motion for Summary Judgment")[1] and a motion by Universal for summary judgment (the "Universal Motion for Summary Judgment"[2])[3]. For the reasons set

---

1. In support of the Joint Motion for Summary Judgment, Chubb and Cornwall submitted: (1) a notice of motion; (2) a joint brief in support of the Joint Motion for Summary Judgment (the "Joint Moving Brief"); (3) the certification of Kevin J. McKenna (the "McKenna Cert."); (4) the certification of Robert M. Sullivan (the "Sullivan Cert."); (5) the certification of Ronald Sposato (the "Sposato Cert."); (6) a joint reply brief in further support of the Joint Motion for Summary Judgment (the "Joint Reply Brief"); and (7) the certification of Kevin J. McKenna in fur-

ther support of the Joint Motion for Summary Judgment (the "McKenna Supp. Cert.").

2. In opposition to the Joint Motion for Summary Judgment, Sylvan submitted: a brief in opposition to the Joint Motion for Summary Judgment (the "Brief in Opposition to the Joint Motion for Summary Judgment").

 Gordon has not submitted any documents in support of or in opposition to the Joint Motion for Summary Judgment.

3. In support of the Universal Motion for Summary Judgment, Universal submitted: (1) a

out below, the Joint Motion for Summary Judgment and the Universal Motion for Summary Judgment are granted.

*Facts*

A. *Background*

Sylvan is engaged in the business of providing educational and testing services. Amended Complaint, ¶ 13. Sylvan is the successor-in-interest to Educational Inroads. *Id.*, ¶¶ 2, 14, 32. Prior to being acquired by Sylvan, Educational Inroads was engaged in the business of providing mobile and modular classrooms, modular buildings and space systems and various educational services, including testing and evaluation. Gordon Cert., ¶ 4.

B. *Facts as They Relate to Chubb and Cornwall*

Sometime in the 1970's, Gordon became the exclusive insurance broker for Educational Inroads. Deposition Testimony of Irwin Gordon (the "Gordon Dep.") at 25:20–31:14, attached as Ex. A to the McKenna Cert; Deposition Testimony of Anthony O'Donnell ("O'Donnell")[4] (the "O'Donnell Dep.") at 41:20–44:24, attached as Ex. B to the McKenna Cert. As its broker, Gordon applied for and procured insurance policies on behalf of Educational

Inroads. Gordon Dep. at 29:3–30:18, 54:9–56:10, 201:10–203:20, attached as Ex. A to the McKenna Cert.; O'Donnell Dep. at 100:17–101:15, attached as Ex. B to the McKenna Cert. In addition, Gordon provided counseling to Educational Inroads with regard to the appropriate types and amounts of coverage. *Id.*

Chubb issued certain property and casualty insurance policies for Educational Inroads (the "Chubb Policies") from 1991 through 1997. Chubb Answer to Amended Complaint, ¶ 16. The Chubb Policies were placed with Chubb by Cornwall, a licensed insurance producer. Joint Moving Brief at 5. Gordon, on behalf of Educational Inroads, procured the Chubb Polices from Cornwall.[5]

1. *The Written Agreements*

Gordon and Cornwall are separate and distinct. Gordon Dep. at 17:2–16, attached as Ex. A to the McKenna Cert. Gordon did not nave a producer or agency agreement with Chubb and could not place any policies with Chubb. O'Donnell Dep. at 126:5–10, attached as Ex. B to the McKenna Cert.; Deposition Testimony of William L. Stroh ("Stroh")[6] (the "Stroh Dep.") at

notice of motion; (2) a brief in support of the Motion for Summary Judgment (the "Universal Moving Brief"); (3) the certification of Scott D. Baron (the "Baron Cert."); (4) the certification of Irwin Gordon (the "Gordon Cert."); (5) the certification of Robert Nicosia (the "Nicosia Cert."); and (6) a reply brief in further support of the Motion for Summary Judgment (the "Universal Reply Brief").

In opposition to the Universal Motion for Summary Judgment, Sylvan submitted: a brief in opposition to the Motion for Summary Judgment (the "Brief in Opposition to the Universal Motion for Summary Judgment").

Gordon has not submitted any documents in support of or in opposition to the Universal Motion for Summary Judgment.

Chubb, Cornwall and Universal will be referred to collectively as the "Moving Defendants."

4. O'Donnell was the former Executive Director of Educational Inroads. O'Donnell Dep. at 8:21–23., attached as Ex. B to the McKenna Cert.

5. Gordon was not authorized to place insurance directly with Chubb. O'Donnell Dep. at 126:5–20, attached as Ex. B to the McKenna Cert.

6. Stroh was the former Controller of Educational Inroads. Universal Moving Brief at 15.

105:8–108:21, attached as Ex. I to the McKenna Cert.

By contrast, Chubb and Cornwall did have an agreement in place at all relevant times (the "Chubb–Cornwall Agreement"). Chubb–Cornwall Agreement, attached as Ex. C to the McKenna Cert. Pursuant to the Chubb–Cornwall Agreement, Cornwall was authorized to, and did place, insurance policies with Chubb. *Id.* The Chubb–Cornwall Agreement was not specific to, and predated, the Educational Inroads policies at issue. *Id.*

On or about 19 March 1993, Gordon and Cornwall entered into a producer agreement (the "Producer Agreement"). Producer Agreement, attached as Ex. D to the McKenna Cert. The Producer Agreement stated, in part:

> [Cornwall] agrees to render invoices for all items covered by this agreement, allowing commission at the rate agreed upon. [Gordon] agrees to pay [Cornwall] premiums within Ten Days of the effective date unless other arrangements have been made and approved by [Cornwall] in advance of the effective date of the Insurance.

Producer Agreement, attached as Ex. D to the McKenna Cert.

The Producer Agreement was neither specific to, nor limited to, the policies at issue. *Id.* Moreover, Chubb was not a party to the Producer Agreement. *Id.*

2. *The Billing Process*

According to Gordon, he presented Educational Inroads with his own invoices (the "Gordon Invoices") for all of its insurance policies, including the Chubb Policies. Gordon Dep. at 46:4–22, 68:14–69:11, 70:14–71:12, 88:13–90:23, attached as Ex. A to the McKenna Cert. Educational Inroads, in turn, rendered the payments identified in the Gordon Invoices directly

to Gordon. *Id.* at 167:9–179:18; O'Donnell Dep. at 108:18–111:11, attached as Ex. B to the McKenna Cert. Gordon billed Educational Inroads well in advance of his receipt of premium quotes from Cornwall and prior to the issuance or delivery of the Chubb Policies. Gordon Dep. at 42:8–18, 68:13–19, 153:19–161:13, 190:8–192:16, 207:4–208:3, attached as Ex. A to the McKenna Cert.

According to Gordon, it was his standard policy to add charges for his services to the premiums, without specifying the amount of, or the basis for, such charges. Gordon Dep. at 40:21–43:19, 67:23–86:22, attached as Ex. A to the McKenna Cert. Specifically, as to the Chubb Policies, the amounts identified in the Gordon Invoices (the "Gordon Premiums") were higher than the properly stated premiums on the corresponding Chubb Policies (the "Chubb Premiums") because the Gordon Premiums included unspecified charges added by Gordon. *Id.* at 88:13–96:4. According to Gordon, neither Chubb nor Cornwall had knowledge of his billing practices. *Id.*

It appears Cornwall rendered and Gordon paid, on a net premium basis, Cornwall Invoices that covered the Chubb Policies and were based on the Chubb Premiums; Cornwall did not receive any sums in excess of the Chubb Premiums from Gordon. Joint Moving Brief at 7 (citing Gordon Dep. at 46:3–47:16, 88:13–96:4). According to Chubb and Cornwall, Chubb never received from Cornwall any sums in excess of the properly stated premiums identified in the policies and reflected in the corresponding Chubb Invoices that were sent to Cornwall. *Id.* Moreover, it appears Chubb never received any money from Gordon and never paid any money to Gordon. Gordon Dep. at 92:7–96:21, attached as Ex. A to the McKenna Cert.; Responses to Interrogatories Nos. 8, 18, 20, attached as Ex.

L to the McKenna Cert. Educational Inroads did not require Gordon to advise it whether, or to what extent, he was charging Educational Inroads service fees or other sums beyond the normal charges of the insurance companies. Gordon Dep. at 68:7–69:11, attached as Ex. A to the McKenna Cert.; O'Donnell Dep. at 111:18–112–11, attached as Ex. B to the McKenna Cert.; Stroh Dep. at 91:24–97:13, attached as Ex. I to the McKenna Cert.

### 3. Alleged "Red Flags"

Sylvan argued that Cornwall and Chubb ignored various "red flags," including, the improper issuance of identification cards by Gordon, the use of a "Chubb" stamp by Gordon and the improper issuance of certificates of insurance by Gordon. Brief in Opposition to the Joint Motion for Summary Judgment at 5. Moreover, Sylvan alleged Chubb did not complete an audit of the policies at issue for the years 1991 through 1997, despite being required to do so. *Id.* 4–5.

### C. Facts as They Relate to Universal

In or about 1982, Educational Inroads approached Gordon for the purpose of applying for and procuring surety bonds on behalf of Educational Inroads. Gordon Cert., ¶ 3. Educational Inroads retained Gordon; in or about March 1986, Educational Inroads, by and through Gordon, applied to Universal for the issuance of surety bonds. *Id.,* ¶¶ 3, 6. Universal approved the application for bonding; from approximately March 1986 through July 1997, Universal issued numerous surety bonds on behalf of Educational Inroads. *Id.,* ¶ 6.

### 1. The Billing Process

Universal charged a premium for each bond issued. Universal Moving Brief at 4. Universal sent its invoice (the "Universal Invoice"), for the premium to Gordon as the broker for Educational Inroads. Gordon Cert., ¶ 7. Gordon, in turn, submitted his own invoice (the "Gordon Invoice") to Educational Inroads. *Id.* In each instance, the Gordon Invoice was higher than the Universal Invoice. *Id.,* ¶¶ 7, 8; Amended Complaint ¶¶ 27, 31, 34, 35, 39, 40, 30.

When Educational Inroads paid the Gordon Invoice, Gordon would remit a portion of what he collected to Universal. Gordon Cert., ¶ 8. The amount Gordon remitted to Universal was always the premium billed by Universal, less a fifteen percent commission for Gordon. *Id.* It appears Universal did not receive any portion of the alleged overcharges paid by Educational Inroads to Gordon. *Id.,* ¶ 8.·

### 2. The Written Agreement

On 16 September 1994, Universal executed a broker agreement (the "Broker Agreement") with Gordon. Broker Agreement, attached as Ex. E to the Opposition Brief. The Broker Agreement required Gordon to provide copies of his Errors and Omissions coverage to Universal. *Id.* According to Sylvan, Gordon failed to provide such policies. Opposition Brief at 3. Moreover, Universal delegated to Gordon the task of having Educational Inroads complete and sign Consent to Rate forms. Deposition Testimony of Antonio Albanese ("Albanese")[7] (the "Albanese Dep.") at 59:7–10. It appears, however, the forms Gordon returned to Universal were forged. O'Donnell Cert., ¶ 5. Sylvan argued that these events should have put Universal on

---

**7.** Albanese was the Vice President of underwriting at Universal from July 1995 through

April 1999. Albanese Dep. at 9:8–14.

notice that Gordon was in financial distress. Brief in Opposition to the Universal Motion for Summary Judgment at 19. According to Sylvan, by disregarding these events, Universal breached its duty of care to Educational Inroads. *Id.*

### D. *Acquisition of Educational Inroads by Sylvan*

As mentioned, Sylvan is the successor-in-interest to Educational Inroads. Amended Complaint, ¶¶ 2, 14, 32. In connection with its acquisition of Educational Inroads, Sylvan terminated the relationship of Educational Inroads with Gordon. Thereafter, Sylvan commenced the instant action.

### Discussion

### A. *Summary Judgment Standard*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *DeHart v. Horn*, 227 F.3d 47, 50 (3d Cir.2000); *Wicker v. Consol. Rail Corp.*, 142 F.3d 690, 696 (3d Cir.1998). "A 'genuine' issue is one where a reasonable jury, based on the evidence presented, could hold in the nonmovant's favor with regard to that issue." *Schoonejongen v. Curtiss–Wright Corp.*, 143 F.3d 120, 129 (3d Cir.1998); *see also Boyle*, 139 F.3d at 393 ("An issue is 'genuine' if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue"); *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir.1996); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir.1995)

("The nonmoving party creates a genuine issue of material fact if [he or she] provides [or points to] sufficient evidence to allow a reasonable jury to find for him [or her] at trial."). Conclusory statements and arguments, however, do not raise triable issues which preclude summary judgment. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 252 (3d Cir.1999) (speculation and conclusory allegations are insufficient to forestall summary judgment); *Sterling Nat'l Mortgage Co., v. Mortgage Corner, Inc.*, 97 F.3d 39, 44 (3d Cir.1996) ("[m]ere speculation about the possibility of the existence of such facts" does not raise a triable issue to defeat a motion for summary judgment).

The present task is to determine whether genuine issues of material fact exist and whether the Moving Defendants are entitled to judgment as a matter of law.[8]

### B. *Agency*

Sylvan has alleged that, pursuant to N.J.S.A. 17:22–6.2A and, or, principles of common law agency, the Moving Defendants are liable to Sylvan for the alleged overpayment of insurance premiums to Gordon. Amended Complaint, ¶¶ 29, 44, 55, 84.

#### 1. *Broker v. Agent*

"An insurance agent is different from an insurance broker, in that the former is authorized to enter into contracts on behalf of the insurance company, whereas the latter procures insurance on behalf of the insured." *Evangelou v. Terzano*, 298 N.J.Super. 467, 475, 689 A.2d 840 (App.Div.1997) (quoting *Lilly v. All-*

---

**8.** New Jersey substantive law applies in this diversity action. *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 613 (3d Cir.1992) (Federal courts sitting in diversity must apply the substantive law of the state whose laws govern the action) (citing *Erie Railroad Co. v. Tomp-* *kins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)); *see also Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 47 F.Supp.2d 523, 527 (1999). Counsel have not suggested that the laws of a jurisdiction other than New Jersey should apply.

*state Ins. Co.*, 218 N.J.Super. 313, 319–20, 527 A.2d 903 (App.Div.1987)): Pursuant to New Jersey law, an "insurance agent" is

a person authorized, in writing, by any insurance company to act as its agent to solicit, negotiate or effect insurance contracts on its behalf or to collect insurance premiums and who may be authorized to countersign insurance policies on its behalf.

N.J.S.A. 17:22A–2f. An "insurance broker" is

a person who, for a commission, brokerage fee, or other consideration, acts or aids in any manner concerning negotiation, solicitation or effectuation of insurance contracts as the representative of an insured or prospective insured; or a person who places insurance in an insurance company that he does not represent as an agent.

N.J.S.A. 17:22A–2g.

■ An "insurance agent," therefore, "represents an insurance company—the insurer. It acts on behalf of that company in providing insurance for some other enti-

ty." *TWBC III, Inc. v. Certain Underwriters at Lloyd's London Subscribing to Policy No. 894*, 323 N.J.Super. 60, 65, 731 A.2d 1228 (App.Div.1999). An "insurance broker," however, "represents the insured or the prospective insured. A broker acts for the insured and represents the insured in obtaining insurance (from an insurance company and perhaps through an insurance agent) for the benefit of the broker's customer, who is the insured." *Id.*

■ In the present matter, Gordon was hired by and worked for Educational Inroads. Gordon Cert., ¶ 3. During the course of his relationship with Educational Inroads, Gordon sought out various insurance and bonding companies and procured insurance policies and surety bonds for Educational Inroads. *Id.*, ¶¶ 3, 6. Moreover, Gordon had no power or authority to bind Chubb or Universal to coverage or issue policies or bonds on behalf of Chubb or Universal. *Id.*, ¶ 3. It appears, therefore, Gordon was an "insurance broker" as opposed to an "insurance agent." [9] *See*

9. The former Executive Director, the Controller and the Vice President of Educational Inroads each acknowledged Gordon was its "broker" and represented Educational Inroads in its efforts to obtain insurance policies and bonds. O'Donnell, the former Executive Director of Educational Inroads, referred to Gordon throughout his deposition testimony as a "broker." O'Donnell Dep. at 54:13–15, 82:21–22, 106:20–21, attached as Ex. D to the Baron Cert. Moreover, Stroh, the former Controller of Educational Inroads, testified as follows regarding Gordon:

A: Basically he should protect the company [Educational Inroads] and get the best possible bond he could.
Q: And he was free to go to any bonding company who would provide the best services to him and to your company. Isn't that true?
A: We didn't tell him that he had to go to any specific company.

Q: He could go anyplace?
A: Correct.

Stroh Dep. at 99:6–14, attached as Ex. E to the Baron Cert. Finally, Richard Tompsen ("Tompsen"), the former Vice President of Educational Inroads, testified as follows regarding Gordon:

Q: Did you understand that Mr. Gordon could place bonds with any number of bonding companies rather than just with Universal?
A: Yeah. Well, he was a broker. From my knowledge of the insurance industries, brokers could deal with any number of different companies.
Q: You knew he [Gordon] was a broker?
A: Yes.
Q: Why do you use the term "agent"?
A: Well, its probably from history. When I worked with State Mutual, the term "agent" was generally used when somebody was employed in that particular company, selling only their products, whether it was Prudential or Metropoli-

*TWBC III*, 323 N.J.Super. at 65, 731 A.2d 1228; N.J.S.A. 17:22A–2g.

■■■■ As a general rule, a broker acts as the agent of the insured, not as the agent of the insurer. *Wang v. Allstate Ins. Co.*, 125 N.J. 2, 13, 592 A.2d 527 (1991). Nevertheless,

> a broker may be an agent of the insurer for the receipt of premiums even though he is the agent of the insured in procuring insurance.... New Jersey follows the general rule that the broker owes a duty to both the insured and the insurer; the broker on placing the policy with the insurer as the agent for the insured, then becomes the agent of the insurer to deliver the policy to the insured and to collect and remit premiums.

*Polar Int'l Brokerage Corp. v. Investors Ins. Co. of Am.*, 967 F.Supp. 135, 140 (D.N.J.1997) (citing *Sheeran v. Sitren*, 168 N.J.Super. 402, 409, 403 A.2d 53 (Law Div.1979)). This principle was codified in N.J.S.A. 17:22–6.2a, which provides:

> Any insurer which delivers in this State to any insurance broker a contract of insurance (other than a contract of life insurance, or life, accident or health insurance) pursuant to the application or request of such broker, acting for an insured other than himself, shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery or payment of any installment of such premium or any additional premium which becomes due or payable thereafter on such contract, provided such payment is

received by such broker within 90 days after the due date of such premium or installment thereof or after the date of delivery of statement by the insurer or such additional premium.

N.J.S.A. 17:22–6.2a; *see also Hermann Forwarding Co. v. Pappas Ins. Co.*, 273 N.J.Super. 54, 62, 640 A.2d 1200 (1994) (stating that N.J.S.A. 17:22–6.2a is simply a codification of the general rule that "where a broker has been entrusted to deliver a policy, the insured may justifiably believe that his [or her] brokerage is authorized to receive payment of premiums ... on the insurer's behalf").

### 2. *Statutory Agency*

As mentioned, Sylvan has alleged that, pursuant to N.J.S.A. 17:22–6.2a, the Moving Defendants are liable for the alleged overpayments to Gordon. Amended Complaint, ¶ 29

■■■■ N.J.S.A. 17:22–6.2a creates a limited agency relationship between a broker and an insurer with regard to the collection of premiums by the broker. N.J.S.A. 17:22–6.2a.

> The purpose of N.J.S.A. 17:22–6.2a is to protect insureds by confirming that an insurance broker who is authorized to deliver policies has the implied or apparent authority to collect the premiums for those policies on behalf of the issuing insurer. The significance of the statute is that by treating the broker as the insurer's agent for the purpose of receiving premiums, it casts the risk on the insurer for any failure by the broker to

---

tan, so forth, whereas a broker would be dealing with any companies that he wanted to or the ones they would want to do business with.

Q: Is it your understanding that Mr. Gordon was an insurance broker rather than an agent?

A: That was my understanding.

Deposition Testimony of Tompsen (the "Tompsen Dep.") at 40:5–25, attached as Ex. F to the Baron Cert.

faithfully transmit the net premiums to the insurer of the policy.

*Roman v. American Fire & Marine Ins. Co.*, 281 N.J.Super. 355, 360–61, 657 A.2d 897 (1995). N.J.S.A. 17:22–6.2a, therefore, protects insureds from the cancellation of insurance due to the failure of a broker to remit premiums to the insurer. *Id.*

■ In the present matter, the alleged misconduct of Gordon had nothing to do with his failure to remit insurance premiums to the Moving Defendants. In fact, the exact premiums charged by Chubb were all remitted by Gordon to Cornwall, who in turn remitted such premiums to Chubb. Gordon Dep. at 46:3–47:16, 88:13–96:4, attached as Ex. A to the McKenna Cert. Likewise, the exact premiums charged by Universal were all remitted by Gordon to Universal. Gordon Cert., ¶ 8. Rather, the alleged misconduct in this case is related to Gordon overcharging his own client, a matter which has nothing to do with the purpose of the statute. *See Roman*, 281 N.J.Super. at 360–61, 657 A.2d 897 (holding that the purpose of N.J.S.A. 17:22–6.2a is to protect insureds from the cancellation of insurance due to the failure of a broker to remit premiums to the insurer).

■ There does not appear to be any reported New Jersey decision specifically addressing the issue of whether, pursuant to N.J.S.A. 17:22–6.2a, amounts charged by a broker in excess of premiums owed on a contract of insurance are deemed paid to the insurer. Nevertheless, such an expansive interpretation of the statute would contravene its limited purpose of protecting insureds from the cancellation of insurance due to the failure of a broker to remit premiums to the insurer. *Roman*, 281 N.J.Super. at 360–61, 657 A.2d 897. Indeed, the express language of N.J.S.A. 17:22–6.2a appears to dictate that the statute should not apply to the fraudulent overcharges of a broker.

■ "The scope of the statutory agency is limited to the collection of premiums on the insurer's behalf 'which [are] *due* on such contract at the time of its issuance or delivery.'" *Millner v. New Jersey Ins. Underwriting Assoc.*, 193 N.J.Super. 653, 657, 475 A.2d 653 (1984)(citing N.J.S.A. 17:22–6.2a)(emphasis added). It appears the reference to a premium "which is *due* on such contract," would exclude fraudulent overcharges from the scope of the limited agency conferred by the statute because such moneys are not "due" on the policies. Moreover, as discussed, the exclusion of fraudulent overcharges by a broker from the limited agency conferred by N.J.S.A. 17:22–6.2a is consistent with the primary purpose of protecting insureds against the cancellation of coverage due to the fault of a broker. *See Roman*, 281 N.J.Super. at 360–61, 657 A.2d 897.[10]

---

10. In *Royal Indemnity Co. v. Niagara County*, 67 A.D.2d 1087, 415 N.Y.S.2d 166 (4th Dept. 1979), the court addressed the issue of whether an insurer could be held vicariously liable for the fraudulent overcharges of a broker, pursuant to Section 121 of the New York Insurance Law (the New York counterpart to N.J.S.A. 17:22–6.2a). Section 121 of the New York Insurance Law (recodified at New York Insurance law § 2121) is virtually identical to N.J.S.A. 17:22–6.2a. *Kubeck v. Concord Ins. Co.*, 103 N.J.Super. 525, 531, 248 A.2d 131 (1968). Section 121 of the New York Insurance Law states, in pertinent part:

[The] insurer ... shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on (an insurance) contract at the time of its issuance or delivery or payment of any installment of such premium or any additional premium which becomes due or payable thereafter on such contract, provided such payment is received by such broker within ninety days after the due date of such premium or installment thereof.

New York Insurance Law § 121.

"Had the legislature intended to treat all premium moneys in the hand of a broker as belonging to the (insurer), it is reasonable to assume that it would have said so in more particular language." *Royal Indemnity*, 415 N.Y.S.2d at 167 (citations omitted). Therefore, the limited statutory agency created by N.J.S.A. 17:22–6.2a is inapplicable to the alleged overcharges of Gordon. Summary judgment, therefore, is appropriate with regard to all claims against the Moving Defendants premised on statutory agency.

### 3. Common Law Agency

"An agency relationship arises when one party authorizes another to act on its behalf while retaining the right to control and direct any such acts." *Rodriguez v. Hudson County Collision Co.*, 296 N.J.Super. 213, 220, 686 A.2d 776 (1997) (citing *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 337, 634 A.2d 74 (1993)). An agent must have authority to act for the principal. *Sears Mortgage*, 134 N.J. at 338, 634 A.2d 74. Such authority may be "actual" or "apparent." *Id.*

#### a. Actual Authority

Actual authority may be either "express" or "implied." *Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT*, 106 F.Supp.2d 606, 617 (D.N.J.

1999) (citing *Reynolds Offset Co. v. Summer*, 58 N.J.Super. 542, 557, 156 A.2d 737 (1959)). "Express authority is manifested through the principal's words or other conduct." *Automated Salvage Transport*, 106 F.Supp.2d at 617 (citing Restatement (Second) of Agency § 26). "In such instances, a principal specif[ies] minutely what the agent is to do." *Id.* (quoting Restatement (Second) of Agency § 7 cmt. c).

By contrast, "[i]mplied authority may be inferred from the nature or extent of the function to be performed, the general course of conducting the business, or from particular circumstances in the case." *Sears Mortgage*, 134 N.J. at 338, 634 A.2d 74 (citations omitted). "For the most part, an agent has implied authority to undertake all transactions necessary to fulfill the duties required of an agent in exercise of express authority." *Automated Salvage Transport*, 106 F.Supp.2d at 617.

In the present matter, it appears Gordon did not have actual authority to collect premiums on behalf of the Moving Defendants.

#### i. Chubb

Sylvan has failed to allege any facts to suggest Gordon had "actual au-

---

In *Royal Indemnity*, the broker in question submitted incorrect and false vouchers in excess of amounts due for premiums on the policies. *Royal Indemnity*, 415 N.Y.S.2d at 167–68. Thereafter, the broker collected the excess premiums from the insured, remitted the proper amount to the insurer and pocketed the difference. *Id.* The insured sought to recover from the insurer the overcharges that it paid to the broker, pursuant to Section 121 of the New York Insurance Law.

The *Royal Indemnity* court found that although Section 121 of the New York Insurance Law held an insurer liable for premium payments made by the insured to its broker, whether or not the broker remitted same to

the insurer, the statute did not contemplate situations where the broker collects payment in excess of the premium. *Royal Indemnity*, 415 N.Y.S.2d at 167. According to the *Royal Indemnity* court:

> Section 121 creates a conclusive presumption that the payment to the broker within the ninety day period is payment to the insurer and anticipates the factual situation where an insurance broker illegally converts payments made on premiums due. *It cannot be extended to include situations where a broker has fraudulently induced an insured to make overpayments.*

*Id.* (emphasis added).

thority" to act on behalf of Chubb. Upon review of the record, there does not appear to have been any grant of authority—express or implied—by Chubb to Gordon. *See* Restatement (Second) of Agency § 7 cmt. c (actual authority is created by the manifestations of the principal to the agent). Indeed, Gordon was not qualified to place insurance directly with Chubb—a fact known by Educational Inroads. O'Donnell Dep. at 126:19–20 ("[Cornwall was] an entity that Mr. Gordon had to go through to deal with [Chubb]."); *see also* Response of Gordon to Interrogatory No. 8, attached as Ex. L to the McKenna Cert. (Q. Describe in detail your relationship, if any, with Chubb? A. None.).

The Producer Agreement, to which Chubb was not a party, does not impose any obligations on the part of Chubb to Educational Inroads. Producer Agreement, attached as Ex. D to the McKenna Cert. Likewise, the Chubb–Cornwall Agreement did not authorize Cornwall to create agency relationships between Chubb and third parties with whom Chubb had no agreements. Chubb–Cornwall Agreement, attached as Ex. C to the McKenna Cert. It appears Gordon did not have actual authority to bind Chubb.

### ii. *Cornwall*

As mentioned, on or about 19 March 1993, Cornwall and Gordon entered into the Producer Agreement. Producer Agreement, attached as Ex. D to the McKenna Cert. Sylvan argued that the Producer Agreement gave Gordon actual authority to collect premiums from Educational Inroads on behalf of Cornwall. Brief in Opposition to Joint Motion for Summary Judgment at 14. The Producer Agreement provided, in relevant part:

> [Cornwall] agrees to render invoices for all items covered by this agreement allowing commission at the rate agreed

upon. *[Gordon] agrees to pay [Cornwall] premiums within Ten Days of the effective date* unless other arrangements have been made and approved by [Cornwall] in advance of the effective date of the Insurance.

Producer Agreement, attached as Ex. D to the McKenna Cert. (emphasis added).

Despite the above-quoted language, the Producer Agreement does not appear to provide Gordon with any authority to act on behalf of Cornwall and, therefore, does not create an agency relationship between those parties.

The Producer Agreement provided that Gordon was an independent contractor and the owner of the accounts for which he placed insurance through Cornwall:

> [Gordon] shall have no authority to bind new or renewal business or make any changes in the terms and conditions of any policy or binder.
>
> . . . . .
>
> Both parties to this agreement expressly recognize the independent ownership by [Gordon] of the insurance business covered by this agreement.

*Id.*

A generous reading of the Producer Agreement does not demonstrate that Cornwall delegated any authority to Gordon to render bills to his insureds. To the contrary, the Producer Agreement expressly made Gordon responsible for all premiums billed:

> [Gordon] guarantees payment of all earned premiums whether collected by him or not, and no payment accepted by Gordon for premium due or a deposit on premium due shall be considered as paid to [Cornwall] until such payment is received by [Cornwall].

*Id.*

Despite the argument of Sylvan, the Producer Agreement does not appear to

provide Gordon with express authority to act on behalf of Cornwall. *See Automated Salvage Transport,* 106 F.Supp.2d at 617 (stating that express authority is manifested by a principal "specif[ying] minutely what the agent is to do") (quoting Restatement (Second) of Agency § 7 cmt. c).

Sylvan, moreover, has failed to demonstrate that Gordon was given "implied authority" to act on behalf of Cornwall. Implied authority is "incidental to a grant of express authority." *Thomas,* 35 F.3d at 1338. As mentioned, implied authority consists of those powers incidental and necessary to carry out a grant of express authority. *Automated Salvage Transport,* 106 F.Supp.2d at 617. In the present matter, as discussed, it does not appear that Cornwall provided Gordon with express authority to act on its behalf. It appears, therefore, Sylvan cannot carry its burden of demonstrating "implied authority" on the part of Gordon.

The record does not reveal that Gordon had either express or implied authority to collect premiums on behalf of Cornwall; Sylvan has failed to demonstrate that Gordon was authorized to act on behalf of Cornwall.

### iii. *Universal*

Sylvan has argued that the Broker Agreement conferred actual authority on Gordon to collect premiums on behalf of Universal. Brief in Opposition to the Universal Motion for Summary Judgment at 5. The Broker Agreement provided, in relevant part:

> [Gordon] agrees to be responsible and guarantee all earned premiums on bonds and is *responsible for collecting proper premiums at all times.*

*Id.* (emphasis added). Based on this provision, Sylvan has contended that Universal placed Gordon in the position to collect premiums and, therefore, in the position to commit fraud. *Id.*

Despite the above-quoted language, it does not appear Gordon was the agent of Universal with regard to billing. As discussed, Gordon was an insurance "broker" for Educational Inroads. *See supra* pp. 538–39. As a broker, Gordon acted for Educational Inroads and represented Educational Inroads in obtaining insurance policies and surety bonds.[11] When Universal sent its invoices to Gordon, Universal, in effect, was submitting the invoices to Educational Inroads because Gordon was the legal representative of Educational Inroads. *See TWBC III,* 323 N.J.Super. at 65, 731 A.2d 1228. Universal, therefore, was not "delegating" the billing function to Gordon. Rather, Universal was sending the bill to the person selected by Educational Inroads to act as its broker.

Even assuming Gordon was the agent of Universal for the limited purpose of collecting premiums, Universal cannot be held liable for the alleged fraudulent conduct of Gordon. "[A] principal may be held liable for damages resulting from his agent's fraudulent representations [only] where the principal has put the agent in such a position that a person of ordinary prudence would be reasonably justified in the assumption that the agent has the authority to make the representation." *Gennari v. Weichert Co. Realtors,* 288 N.J.Super. 504, 547, 672 A.2d 1190 (1996); *see also* Restatement (Second) of Agency § 261 ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud

---

11. An "agent," on the other hand, acts on behalf of the insurance company in providing insurance for some other entity. *TWBC III,* 323 N.J.Super. at 65, 731 A.2d 1228.

upon third persons is subject to liability to such third person for the fraud.").

In the present matter, it appears that Universal did not place Gordon in the position to commit fraud. As discussed, Educational Inroads was required to obtain bonds on a periodic basis in order to conduct its business. Gordon Cert., ¶ 5. It appears that each time Educational Inroads was required to obtain a bond, it turned to Gordon for assistance. *Id.*, ¶¶ 3, 6. Educational Inroads selected Gordon as its representative to transmit information to the surety, to make requests for the issuance of bonds, to take delivery of the bonds and to receive the invoices issued by the surety. *Id.* Universal did not select Gordon; Universal did not authorize Gordon to issue bonds; Universal did not give Gordon any authority to bind the surety; and Universal did not control the manner in which Gordon conducted business with his client, Educational Inroads. *Id.* Therefore, it appears Educational Inroads, not Universal, placed Gordon in a position to allegedly overbill Educational Inroads.

Because Universal did not place Gordon in a position to commit fraud, Universal cannot be held liable for the alleged overbilling by Gordon. *Gennari*, 288 N.J.Super. at 547, 672 A.2d 1190 (holding that a principal may only be held liable for damages resulting from the fraudulent conduct of his agent where the principal put the agent in the position to commit the fraud).

### b. *Apparent Authority*

Even if a person or entity is not an "actual agent," that person or entity may be an agent by virtue of "apparent authority." *Sears Mortgage*, 134 N.J. at 338, 634 A.2d 74; *see also In re Beesley's Point Sea–Doo, Inc.*, 956 F.Supp. 538, 543 (D.N.J.1997). "Apparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority." *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1439 (3d Cir.1994) (citations omitted). Apparent authority, therefore, "imposes liability on the principal not as a result of an actual contractual relationship, but because the principal's actions have misled a third-party into believing that a relationship of authority in facts exists." *Mercer v. Weyerhaeuser Co.*, 324 N.J.Super. 290, 317, 735 A.2d 576 (1999).

In such instances, the factual question which arises is whether the

> principal, by his [or her] voluntary actions, placed the agent in such a situation that a person of ordinary prudence, conversant with general business practice, is justified in believing that the agent had authority to perform the act in question.

*Automated Salvage Transport*, 106 F.Supp.2d at 619 (citing *Newark Branch, NAACP v. Township of West Orange, N.J.*, 786 F.Supp. 408, 424 (D.N.J.1992); *Mercer*, 324 N.J.Super. at 318, 735 A.2d 576). More specifically, in order to demonstrate apparent authority, the plaintiff must establish the conduct of the alleged principal created the appearance of authority and a third party reasonably relied on the apparent authority of the agent to act for a principal. *Id.*

In the present matter, Sylvan alleged that "Educational Inroads reasonably believed based on the actions of Chubb, Cornwall & Stevens and Universal that Gordon had apparent authority to perform the premium billing and collection function for Chubb, Cornwall & Stevens and Universal." Amended Complaint, ¶ 22. In support of this allegation, Sylvan cited to certifications from Stroh (the "Stroh Cert.") and O'Donnell (the "O'Donnell Cert.") Brief in Opposition to the Joint

Motion for Summary Judgment at 15. In their respective certifications, both Stroh and O'Donnell stated:

> It was my impression that the payments that [Educational Inroads] made to Gordon for the insurance products issued by Universal and Chubb were for insurance and bond premiums charged by Universal and Chubb. I was under the impression that Gordon would be paid by Universal and Chubb. I was under the impression that Gordon was sending invoices to [Educational Inroads] in order to collect premiums for Chubb and Universal. Chubb and Universal did not bill [Educational Inroads] directly.

O'Donnell Cert., ¶ 5, attached as Ex. D to the Brief in Opposition to the Joint Motion for Summary Judgment; Stroh Cert., ¶ 5, attached as Ex. E to the Brief in Opposition to the Joint Motion for Summary Judgment.

As mentioned, in order to demonstrate apparent authority, Sylvan must point to some voluntary act or manifestation by the Moving Defendants that misled Educational Inroads into believing that a relationship of authority existed between the Moving Defendants and Gordon. *Mercer*, 324 N.J.Super. at 317, 735 A.2d 576; *Wilzig v. Sisselman*, 209 N.J.Super. 25, 35, 506 A.2d 1238 (1986). The record does not reveal any voluntary acts or manifestations by the Moving Defendants that could be said to have misled Educational Inroads into believing a relationship of authority existed between the Moving Defendants and Gordon.

Gordon operated out of his own offices and used his own letterhead for correspondence, billings and invoices. Joint Moving Brief at 30. Moreover, neither O'Donnell nor Stroh stated that their "impression" that Gordon was collecting premiums on behalf of the Moving Defendants was in any way attributable to the actions of the Moving Defendants.[12] *See Mercer*, 324 N.J.Super., at 318, 735 A.2d 576 (a plaintiff must establish that "the appearance of authority has been created by the conduct of the alleged principal and it cannot be established alone and solely by proof of [conduct by] the supposed agent") (internal citations and quotations omitted). Furthermore, as discussed, Educational Inroads knew that Gordon was not authorized to place insurance directly with Chubb. Stroh Dep. at 104:24–108:10, attached as Ex. I to the McKenna Cert.; O'Donnell Dep. at 126:5–20, attached as Ex. B to the McKenna Cert. Therefore, Sylvan has failed to set forth any conduct on the part of the Moving Defendants which could have caused Educational Inroads to reasonably believe Gordon had authority to act for the Moving Defendants.[13] Because it appears Sylvan cannot

---

12. Cornwall is not mentioned in either the O'Donnell Certification or the Stroh Certification. O'Donnell Cert., ¶ 5, attached as Ex. D to the Brief in Opposition to the Joint Motion for Summary Judgment; Stroh Cert., ¶ 5, attached as Ex. E to the Brief in Opposition to the Joint Motion for Summary Judgment.

13. It appears that it would have been unreasonable for Educational Inroads to conclude Gordon was only charging the Chubb Premiums for the coverage and services he provided. To the extent that Educational Inroads was operating under such a belief, it appears to have been based on its own assumptions, as opposed to any representations by Chubb. Indeed, the testimony of O'Donnell suggests that it was not reasonable for Educational Inroads to assume Gordon was not adding service fees to his premiums:

> Q. You indicated that you tried to discuss with Mr. Gordon the amount of his fees or his commission, whichever word we use?
>
> A. Well, we didn't go too far with it. I was trying to get a handle on how this worked and I got nowhere. So in my mind, it was worth an exploratory discussion to see if there's a way to get a break

demonstrate the Moving Defendants misled Educational Inroads into believing a relationship of authority existed between themselves and Gordon, any claims by Sylvan that Gordon was acting under the apparent authority of the Moving Defendants lack merit.

Therefore, having found no basis for finding an agency relationship between the Moving Defendants and Gordon, the Moving Defendants are entitled to summary judgment, in their favor, to the extent the claims of Sylvan are premised on common law theories of agency.

### C. *Negligence*

Sylvan has alleged the Moving Defendants were negligent in failing to monitor and supervise Gordon. Amended Complaint, ¶ 49.

 "[A]n independent tort action is not cognizable where there is no duty owed to the plaintiff other than the duty arising out of the contract itself." *Stewart Title Guar. Co. v. Greenlands Realty L.L.C.*, 58 F.Supp.2d 370, 386 (D.N.J.1999) (quoting *Int'l Minerals and Mining Corp.*

*v. Citicorp North America, Inc.*, 736 F.Supp. 587, 597 (D.N.J.1990)) (applying New Jersey law); *see also Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.*, 116 N.J. 517, 535, 562 A.2d 208 (1989). Therefore, in order for an action based on negligence to be cognizable against either Chubb or Universal, it must rest on a duty independent of the contractual duties Chubb and Universal owed to Educational Inroads. *Id.* As discussed, Gordon was neither the statutory nor common law agent of Chubb or Universal. It appears, therefore, neither Chubb nor Universal owed Educational Inroads any obligations independent of their contractual duties under the Chubb Policies and the Universal Bonds.

 Even assuming the Moving Defendants owed Educational Inroads a duty sounding in tort to either inform Educational Inroads of pricing or to supervise Gordon with respect to his collection and remittance of premiums, the negligence claims of Sylvan are without support in the record.

---

somewhere along the line, but he would never divulge what his end of this was.

Q. The break was if he reduced his fee, then the net amount that the companies would pay for their insurance would be less?

A. I had no idea. I was trying to explore if there was any possibility to get better pricing, and I thought that would lead somewhere, but it was a door that was not opening at all, so it never went anywhere beyond the beginnings of a discussion.

O'Donnell Dep. at 60:16–61:11, attached as Ex. B to the McKenna Cert. When O'Donnell raised the issue of cutting the insurance costs of Educational Inroads, Gordon stated, "it was none of [O'Donnell's] business and if [he] wanted to find out, [he] should go out in the marketplace and see if [he] could find a better price." *Id.* at 59:8–11.

Nevertheless, in the face of such resistance, it appears Educational Inroads did not pursue a direct answer from Gordon as to what his compensation was and whether it could be reduced. Gordon Dep. at 66:20–69:11, 93:16–94:11, attached as Ex. A to the McKenna Cert.; O'Donnell Dep. at 57:2–66:11, 111:2–111:11, attached as Ex. B to the McKenna Cert.; Stroh Dep. at 91:24–97:13, attached as Ex. I to the McKenna Cert. Moreover, it appears Educational Inroads never followed up with Cornwall or Chubb about the costs of its insurance and the different components of those costs. Sposato Cert., ¶ 7 ("Prior to the institution of this litigation there was no inquiry by Sylvan or [Educational Inroads] regarding the actual premiums on the policies."); O'Donnell Dep. at 157:4–21, attached as Ex. B to the McKenna Cert.; Tompsen Dep. at 62:8–15, attached as Ex. H to the McKenna Cert.; Stroh Dep. at 186:4–188:7, attached as Ex. I to the McKenna Cert.

It appears the Moving Defendants properly discharged any duty they might have owed Educational Inroads to inform it of the pricing on the Chubb Policies and Universal Bonds. When Chubb delivered the Chubb Policies to Cornwall, the Chubb Policies identified the proper premiums and payment schedules. Gordon Dep. at 109:8–116:20, attached as Ex. A to the McKenna Cert. Moreover, when Gordon received the Chubb Policies from Cornwall, the Chubb Policies identified the proper premiums and payment schedules. *Id.* In addition, when Universal delivered the Universal Bonds to Gordon, the Universal Bonds identified the proper premium. Gordon Cert., ¶¶ 7–9.

■ The delivery of information by an insurance company or insurance intermediary to the broker of the insured is tantamount to providing that information to the insured. *TWBC III*, 323 N.J.Super. at 66, 731 A.2d 1228. The *TWBC III* court stated:

A principal who selects someone to act for him [or her] is generally bound by the acts of that person within the apparent authority which he [or she] knowingly permits the person to assume. Under that principle we can see no reason why notice to the broker chosen by plaintiffs to act for them should not be deemed notice to plaintiffs themselves.

*Id.* (citing *Mann v. Interstate Fire Casualty Co.,* 307 N.J.Super. 587, 595, 705 A.2d 360 (1998); *Sears Mortgage Corp.,* 134 N.J. at 337–38, 634 A.2d 74) (internal quotations omitted).

In the present matter, Educational Inroads retained Gordon as its broker, and Gordon used Cornwall to procure insurance policies from Chubb. It appears the Chubb Policies and the premium invoices, as issued by Chubb, were forwarded to Cornwall. Gordon Dep. at 109:8–116:20, attached as Ex. A to the McKenna Cert.

Cornwall, in turn, forwarded the Chubb Policies and premium invoices to Gordon, as the agent of Educational Inroads. *Id.*

Likewise, Gordon, acting as the broker for Educational Inroads, procured surety bonds from Universal. It appears that the Universal invoices, as issued by Universal, were forwarded directly to Gordon. Gordon Cert., ¶ 7.

Notice of the premiums delivered to Gordon constituted notice to Educational Inroads of such premiums. *TWBC III,* 323 N.J.Super. at 66, 731 A.2d 1228. Any duty owed by the Moving Defendants to notify Educational Inroads of the premiums on the Chubb Policies and Universal Bonds was discharged when the Chubb Invoices and Universal Invoices were forwarded to Gordon. *Id.*

■ It appears, moreover, any duty the Moving Defendants owed to Educational Inroads to supervise Gordon with respect to his collection and remittance of premiums was either not triggered or discharged.

As mentioned, Sylvan argued the Moving Defendants "ignored tell-tale 'red flags' indicating trouble." Brief in Opposition to the Joint Motion for Summary Judgment at 35; Brief in Opposition to the Universal Motion for Summary Judgment at 18–19.

With regard to Chubb and Cornwall, the alleged "red flags" included improper issuance of identification cards and certificates of insurance by Gordon, as well as the creation and use of a Chubb stamp by Gordon. Brief in Opposition to the Joint Motion for Summary Judgment at 35. In addition, Sylvan argued the Moving Defendants failed to undertake basic management techniques, such as those set forth in a Chubb handbook (the "Chubb Handbook") entitled "Managing the Chubb Agent/Broker Relationship." *Id.* Accord-

ing to Sylvan, the Chubb Handbook required Chubb to analyze the financial records of Gordon. *Id.*

Sylvan has offered no explanation as to how these asserted "red flags" should have put Cornwall or Chubb on notice that Gordon might have been overcharging Educational Inroads. *See Ridgewood Bd. of Educ.*, 172 F.3d at 252 (conclusory allegations are insufficient to forestall summary judgment). Moreover, Sylvan has not alleged, nor does the record indicate, Chubb had any knowledge of the alleged "red flags." In addition, by its own terms, the Chubb Handbook did not apply to Gordon because Chubb never appointed him to act as an agent or broker on its behalf. Indeed, the Chubb Handbook cannot give rise to a broker or agent relationship between Gordon and Chubb that did not otherwise exist.

With regard to Universal, Sylvan has argued that Universal was negligent in failing to terminate Gordon in the face of "obvious signs of impropriety and financial distress." Brief in Opposition to the Universal Motion for Summary Judgment at 2. As mentioned, the Broker Agreement required Gordon to provide copies of his Errors and Omissions coverage to Universal. *Id.* According to Sylvan, Gordon failed to provide such policies. *Id.* 3. Universal delegated to Gordon the task of having Educational Inroads complete and sign Consent to Rate forms. Albanese Dep. at 59:7–10. It appears, however, the forms Gordon returned to Universal were forged. O'Donnell Cert., ¶ 5. According to Sylvan, Universal disregarded these "red flags," thereby breaching its duty of care to Educational Inroads. Brief in Opposition to the Universal Motion for Summary Judgment at 19.

Sylvan has not set forth how the alleged failure to provide Errors and Omissions coverage and the alleged forging of signatures on Consent to Rate forms would put Universal on notice that Gordon was allegedly overcharging Educational Inroads. Indeed, Sylvan has not alleged, nor does the record indicate, that there is any connection between such conduct and the alleged overcharges of Gordon. Such a conclusory argument by Sylvan is insufficient to preclude summary judgment. *See Ridgewood Bd. of Educ.*, 172 F.3d at 252 (speculation and conclusory allegations are insufficient to forestall summary judgment).

Because it appears Sylvan cannot demonstrate a breach of any duty owed by the Moving Defendants to Educational Inroads, the negligence claims of Sylvan are dismissed.

### D. *Contract Claims Against Chubb*

■■■ At least some of the policies entered into between Educational Inroads and Chubb contained an "audit premium clause" (the "Audit Premium Clause"), which stated:

> This insurance premium is issued based on estimated premiums.
>
> The earned premium will be computed at the end of each audit period. It will also be computed at insurance termination. The audit period is stated in the Declarations. The estimated premiums are credited against the earned premiums. If the earned premium is less that the premium paid, we agree to return the excess premium. If the earned premium exceeds the estimated premium, you agree to pay the additional premium on our notice to you.

Liability Policy Conditions, attached as Ex. I to the Brief in Opposition to the Joint Motion For Summary Judgment. According to Sylvan, pursuant to the Audit Premium Clause,

Chubb had a contractual duty to undertake an audit of Educational Inroads' records upon termination of the policy at issue, in order to determine the "actual" earned premiums. If the amount paid by Educational Inroads exceeded that amount, Chubb had a duty to return the amounts paid in excess of the "actual" earned premiums.

Brief in Opposition to the Joint Motion for Summary Judgment at 30. Sylvan argued that because Educational Inroads paid more than the actual earned premiums to "Chubb's agent for the receipt of premiums, Irwin Gordon," Chubb breached its contract with Educational Inroads by never undertaking a premium audit and by failing to return amounts paid by Educational Inroads in excess of earned premiums. *Id.* Such an argument, however, appears misplaced.

The overcharges at issue were not premiums under the Chubb Policies and, therefore, were not subject to the Audit Premium Clause. Moreover, audit premium clauses are commonly included in liability policies and reflect the fact that the premiums on some policies are based on estimates received from the insured at the time the insurance is sought. Holmes' Appelman on Insurance 2d, Vol. 6, § 35.1, p. 59 (1998) ("Many liability policies are on an audit premium basis. Customarily, the term 'audit premium' means that the premium stated on the declaration page ... of the insurance policy is only an *estimate*."). According to Chubb, consistent with the common industry practice, the Audit Premium Clause was incorporated into the Chubb Policies to allow for any necessary adjustments to the quoted premium based on any changes in the business of Educational Inroads that would impact the premium. Joint Moving Brief at 35–36.

There are no allegations in this matter that Chubb failed to reduce the premiums

on any of the Chubb Policies in light of changed circumstances impacting the basis upon which the premiums were estimated (*e.g.,* a reduction in the number of cars, trailers or students). Instead, Sylvan sought the return of alleged overcharges paid to Gordon, not Chubb, by recharacterizing them as "unearned premiums." The contract claim of Sylvan, therefore, appears to rest on agency theories. Nevertheless, as discussed above, it appears there was no agency relationship between Chubb and Gordon. Therefore, because the alleged overcharges paid by Educational Inroads to Gordon cannot be attributed to Chubb, the contract claim of Sylvan appears to lack merit.

### E. *Consent to Rate Claim Against Universal*

According to Universal, less than three weeks before the initial trial date in this matter, Sylvan, by way of a supplemental expert report, purported to assert a claim that Universal itself overcharged Educational Inroads on projects outside of New Jersey, as a result of its allegedly failing to obtain and file valid Consent to Rate forms. Baron Cert., ¶ 2. Moreover, in its proposed jury charges, Sylvan cited certain statutory provisions in Maryland, Louisiana and New York, which Sylvan alleged were violated by Universal. *Id.,* ¶ 3. Sylvan included this claim—entitled "Consent to Rate Claim"—as Point VIII in its trial memorandum. *Id.,* ¶ 4.

Universal has contended the "consent to rate claim" was never pleaded by Sylvan and, therefore, is not part of this case. Moving Brief at 20. In response, Sylvan argued that the "Amended Complaint plainly states that 'Defendants' failure to charge only actual approved premiums has caused Educational Inroads injury.'" Opposition Brief at 20 (citing Amended Complaint, ¶ 60). Therefore, according to Syl-

van, this allegation placed Universal on notice that Sylvan was bringing a claim based on a failure to charge approved rates. Opposition Brief at 20.

Nowhere in the pleadings is it alleged that Universal, separate and apart from Gordon, overcharged Educational Inroads for bonds. In addition, the Amended Complaint does not allege Universal violated any out-of-state laws. Indeed, all allegations against Universal in the Amended Complaint are vicarious and derivative of the conduct of Gordon.

Sylvan cannot slip its "Consent to Rate Claim" under the rubric of Count III or Count VII of the Amended Complaint. Count III of the Amended Complaint alleges a failure to charge approved rates in violation of N.J.S.A. 17:29A–15. Count III of the Amended Complaint states that "[d]efendants breached their obligations to Educational Inroads by *Gordon's* failing to charge the actual approved premiums." Amended Complaint, ¶ 59 (emphasis added). The allegations against Universal in Count III of the Amended Complaint are based on the conduct of Gordon, not Universal.

Count VII of the Amended Complaint alleges violations of the Consumer Fraud Act, with no particular allegations against Universal. Amended Complaint, ¶¶ 85–92. Count VII of the Amended Complaint fails to allege any fraudulent conduct on the part of Universal. *Id.* Indeed, the claim against Universal in Count VII is vicarious and derivative of the conduct of Gordon. Amended Complaint, ¶ 86 ("Gordon, agent for Chubb, Cornwall & Stevens, and Universal for billing and collecting premiums ..., directly and fraudulently induced Educational Inroads ...."), ¶ 87 ("Gordon misrepresented certain material facts ...."), ¶ 88 ("Gordon's actions constitute an unconscionable commercial practice ... under the New Jersey Consumer Fraud

Act."), ¶ 90 (Universal is "liable for Gordon's violations" of 56:8–1 *et seq.*).

It appears the "Consent to Rate Claim" of Sylvan has never been part of this case. Any purported claim by Sylvan against Universal of improper rating will be dismissed.

*Conclusion*

For the reasons set forth above, the Joint Motion for Summary Judgment and the Universal Motion for Summary Judgment are granted.